

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of D.L.B. (DOB 11/01/08), minor child. | NO. 92448-1 |
| STATE OF WASHINGTON, DEPARTMENT OF SOCIAL AND HEALTH SERVICES, | EN BANC |
| Respondent, | Filed ___JUL 14 2016___ |
| v. | |
| EDELYN SAINT-LOUIS, | |
| Petitioner. | |

GORDON McCLOUD, J.—In 2013, the legislature enacted amendments to the dependency statutes to expressly address "the rights of parents who are incarcerated." FINAL B. REP. ON SUBSTITUTE H.B. 1284, 63d Leg., Reg. Sess. (Wash. 2013) (SHB 1284). One critical provision in those amendments requires the dependency court to consider several factors "[i]f the parent *is* incarcerated." RCW 13.34.180(1)(f) (emphasis added). Those factors bar a court from assuming that incarceration will make it impossible to parent; they focus instead on the sufficiency

of the Department of Social and Health Services' (Department) services and the parent's efforts, requiring the court to evaluate those things on a case-by-case basis.

Petitioner Edelyn Saint-Louis was incarcerated in the middle of a dependency proceeding that lasted just over 2 years, but was released 1 month and 10 days before the termination trial began. The main question presented here is one of statutory interpretation: does RCW 13.34.180(1)(f)'s requirement that certain factors be considered at the termination hearing "[i]f the parent is incarcerated" apply if the parent isn't incarcerated at that time?

We hold, based on the language and purpose of the amendments, that the answer is no. Other portions of the amended statute already require the Department to offer adequate services to all parents (incarcerated or not), and other portions of the amended statute already bar termination if the Department has failed to offer such services to parents (incarcerated or not); hence, other portions of the statute already ensure that the parent's history (including past incarceration) is considered and accommodated. The provision at issue in this case, by contrast, looks to the incarcerated parent's ability to parent in the future. Limiting its application to those incarcerated at the time of the termination hearing thus fits well into the statutory scheme.[1]

---

[1] Saint-Louis moved to strike the brief filed in this court by D.L.B.'s court-appointed special advocate (CASA). The appellate court has discretion to accept such a brief for

FACTS

Saint-Louis gave birth to D.L.B. on November 1, 2008. In February 2012, D.L.B. was taken into protective custody and Saint-Louis entered a voluntary agreement placing D.L.B. in temporary (30-day) foster care. Saint-Louis also told department social workers that she planned to move from Seattle to Chicago to live with D.L.B.'s father and paternal aunt. But the Department soon learned that a lifetime no-contact order barred D.L.B.'s father from contacting both Saint-Louis and D.L.B.

Nevertheless, on March 15, 2012, a shelter care hearing was held and the juvenile court released D.L.B. back to Saint-Louis's care, contingent on her abiding by the terms of the no-contact order against D.L.B.'s father and having no other men in her home with D.L.B.

Then, on April 17, 2012, D.L.B. was placed back into foster care. This time it was at Saint-Louis's request.[2]

---

filing. *See* RCW 13.34.030(11) (CASA performing substantially the same duties as guardian ad litem shall be deemed a guardian ad litem for all purposes of dependency and termination statutes); GALR 2(j), 4(h) (guardian ad litem is treated as a party, but only for certain purposes and only in superior court). Exercising our discretion, we deny the motion to strike.

[2] This fact, like many others, was disputed. This opinion takes its summary of the facts from the trial court order resolving those disputes.

D.L.B. was found dependent on May 11, 2012. The dependency court ordered Saint-Louis to obtain a psychological evaluation with a parenting component, follow the recommended treatment, participate in a domestic violence support group, submit to random urine analyses (UAs) for 90 days, and obtain a drug and alcohol evaluation. The court also allowed Saint-Louis to have two supervised visits with D.L.B. per week, with the possibility of more visits to be worked out in consultation with D.L.B.'s court-appointed special advocate (CASA).

The psychologist who performed the court-ordered evaluation (Dr. Steve Tutty) diagnosed Saint-Louis with bipolar II disorder, alcohol and marijuana abuse, a panic disorder, and a learning disorder with "a rule out" of Histrionic personality disorder. He recommended that Saint-Louis obtain a medical consultation regarding medication for her disorders and a drug and alcohol evaluation to address her alcohol and cannabis use, that she enroll in a parenting class called the Incredible Years parent education program, and that she attend a domestic violence support group. Tutty's report stated that "[i]t is expected that [Saint-Louis will] complete these services *in the next six months*," and recommended that reunification with D.L.B. not occur unless Saint-Louis made "significant progress in . . . mood regulation, sobriety, parenting skills, and stable housing" during that time. Ex. 16, at 16.

Saint-Louis completed a 28-day inpatient treatment program for drug and alcohol addiction at Sound Mental Health in December 2012. She then met twice

4

with Alyssa Livingston, the department social worker assigned to D.L.B.'s dependency, to make a formal service plan. This plan included outpatient addiction treatment with random UAs, participation in the Incredible Years program and a domestic violence support group, and mental health counseling.

Saint-Louis's participation in these services, however, was spotty. She completed a formal outpatient addiction treatment program but was never able to complete the required 90 days of clean UAs afterward. She completed participation in a domestic violence support group, but not the Incredible Years program, even though she was referred to it four different times. Saint-Louis also regularly missed scheduled visitations with D.L.B.

In May 2013, the Department held another meeting with Saint-Louis. Livingston and others at this meeting explained to Saint-Louis how serious her situation was, given that D.L.B. had already been in foster care for over 12 months, but they also told Saint-Louis that they would give her three more months before referring the case for termination. They told Saint-Louis that they needed to see significant progress during these months or the Department would not agree to reunification.

Two months later, Saint-Louis was involved in a hit-and-run. She was arrested, spent a month in jail (July 2013 to August 2013), and was then released to

a jail alternative (King County's Community Center for Alternative Programs (CCAP)).

On November 14, 2013, the dependency court entered an updated "Permanency Planning Hearing Order," finding that Saint-Louis had not progressed toward correcting her parental deficiencies, Ex. 6, at 5, making no modifications to the existing services plan, and directing the Department to file a petition for termination. Meanwhile, in the criminal case, Saint-Louis violated CCAP's requirements and was returned to jail on November 21, 2013, pending trial.

Saint-Louis's progress in required services at this point was disputed. Saint-Louis testified that she was 5 weeks along in the 18-week Incredible Years program when she returned to jail. Livingston testified that Saint-Louis was not engaged in any required services between the planning meeting in May 2013 and her return to jail in November 2013, even though Saint-Louis was incarcerated for only 1 of those 6 months.

Saint-Louis pleaded guilty on December 16, 2013, to hit-and-run (attended), a gross misdemeanor, and vehicular assault and taking a car without permission, both felonies. In January 2014, she was sentenced to 12 months for one felony and 3 months for the other. The sentencing court allowed Saint-Louis to serve her entire term on work release, which would have enabled her to participate in all dependency court-ordered services. But Saint-Louis actually participated in work release for

6

only 22 days over two separate periods. The first period of work release was from March 17 to March 25; this ended because Saint-Louis violated a work release requirement. The second period was for 15 days, beginning April 11, 2014. At some point during these 15 days, Saint-Louis met with Livingston to discuss visitation, reenrollment in the Incredible Years program, and other services. Livingston once again referred her for the required services. But before Saint-Louis could begin any of them, she again violated the conditions of her release, and it was revoked. The trial court offered to reinstate work release almost immediately, but Saint-Louis declined. She chose to finish her sentence in total confinement instead. She testified that she knew this meant she would not see D.L.B. until her sentence expired about two months later. She also knew that she would not be able to provide the required UAs if she relinquished work release, but could provide them if she remained on work release.

In jail, Saint-Louis received one-on-one mental health services twice a week from November 2013 (the beginning of her sentence) until March 2014 (the first time she attempted work release). She also voluntarily participated in domestic violence classes. Saint-Louis testified that the jail had other structured services, including a chemical dependency program, but that the domestic violence class was the only one available to her. Livingston testified that she contacted the jail to find

out what services Saint-Louis could receive there, and that the only services to which she could refer Saint-Louis in jail were the mental health services.

When Saint-Louis was released on June 18, 2014, she called Livingston to again discuss visitation and services. At the termination hearing, Saint-Louis claimed that she had already enrolled in the Incredible Years program, relapse prevention and anger management programs, and mental health counseling. She did not inform the Department about her participation in any of these services, however, until she testified at the termination hearing. Saint-Louis also moved in with her boyfriend, a man with a history of domestic violence; Saint-Louis was expecting a baby with this man, due in March 2015. On the first day of the termination hearing, Saint-Louis testified that she lived with her mother. That's what she had been telling the Department during the dependency. On the second day, however, when confronted with contradictory information, Saint-Louis admitted for the first time that she was actually living with this man.

All in all, Saint-Louis spent about eight months in jail (from July 2013 to August 2013 and from November 2013 to June 2014). At the time of trial (July 28, 2014 through August 5, 2014), Saint-Louis had been in the relapse prevention program for one week. She was also enrolled in the Incredible Years program (which had not yet started at the time of trial), an anger management program, and one-on-one mental health counseling. She testified, however, that all these services

8

were arranged in the last week and that she was still at the stage of making a treatment plan.

*Procedural History*

The trial court terminated Saint-Louis's parental rights, and Saint-Louis appealed on three grounds. First, she argued that the trial court erred by failing to apply a 2013 amendment to the dependency statutes that requires trial courts to make certain considerations before terminating the rights of a parent who "is incarcerated." *In re Dependency of D.L.B.*, 188 Wn. App. 905, 915, 355 P.3d 345 (2015) (quoting LAWS OF 2013, ch. 173, § 4(1)(f)), *review granted*, 184 Wn.2d 1034, 366 P.3d 932 (2016). Second, she argued that the Department failed to prove it made reasonable efforts to provide her with all available services during her incarceration and thus failed to satisfy the prerequisite to termination codified at RCW 13.34.180(1)(d). *Id.* at 919. In support of this argument, she relied mainly on a different part of the 2013 amendment, which provides that the permanency plan for a dependency involving an incarcerated parent "must 'include treatment that reflects the resources available at the facility where the parent is confined.'" *Id.* at 921 n.10 (quoting RCW 13.34.136(2)(b)(i)(A)). Third, she challenged the sufficiency of the evidence to support two other prerequisites to termination: that she was currently unfit to parent and that there was little likelihood that her parental deficiencies would be remedied

9

in the near future. *Id.* at 921 (citing RCW 13.34.180(1)(e); *In re Welfare of A.B.*, 168 Wn.2d 908, 921, 232 P.3d 1104 (2010)).

The Court of Appeals rejected all three arguments.[3] Saint-Louis filed a motion for discretionary review, raising all three challenges again.[4]

## ANALYSIS

The main issue in this case is the interpretation of a single provision within the much broader 2013 amendment to the dependency statutes. We begin with an overview of that 2013 amendment to provide context.

In 2013, the legislature passed SHB 1284, a law amending the existing dependency statutes to expressly address "the rights of parents who are incarcerated." This law took effect on July 28, 2013, around the same time that Saint-Louis was involved in the hit-and-run. LAWS OF 2013, ch. 173, § 1; Termination Trial (TR) (July 28, 2014) at 63. SHB 1284 enacted seven new provisions related to a parent's incarceration at various stages of a dependency.

---

[3] The court did, however, address all of these arguments on the merits, despite the Department's assertion that Saint-Louis waived her first argument by failing to raise it at the termination hearing. *D.L.B.*, 188 Wn. App. at 916 n.8 ("this court has discretion to review a claim raised for the first time on appeal, and we exercise that discretion here" (citing *State v. Blazina*, 182 Wn.2d 827, 834-35, 344 P.3d 680 (2015))).

[4] She also moved in this court for a stay of adoption proceedings, which our commissioner granted.

Two of these provisions relate to family reunification services for incarcerated parents. One provision grants an incarcerated parent the absolute right to participate in case conferences[5] "through the use of a teleconference or videoconference" if the parent is unable to attend in person. LAWS OF 2013, ch. 173, § 1(3). The other provides that the permanency plan[6] developed for the child of an incarcerated parent must, "where possible, . . . include treatment that reflects the resources available at the facility where the parent is confined [and] . . . provide for visitation opportunities, unless visitation is not in the best interests of the child." LAWS OF 2013, ch. 173, § 2(2)(b)(i).

Two other provisions address a parent's incarceration as it relates to the timeline for filing a termination petition. One states that a parent's current or prior incarceration constitutes "good cause" to extend the normal timeline for filing a termination petition, if the parent still "maintains a meaningful role in the child's

---

[5] These must occur "[f]ollowing shelter care and no later than thirty days prior to fact-finding," and "[a]t any other stage in a dependency . . . upon the parent's request." RCW 13.34.067(1)(a), (2).

[6] A permanency plan must be developed "no later than sixty days from the time the supervising agency assumes responsibility for providing services, including placing the child, or at the time of [the dependency] hearing . . . whichever occurs first." RCW 13.34.136(1). It must address, among other things, "what services the parents will be offered to enable them to resume custody, what requirements the parents must meet to resume custody, and a time limit for each service plan and parental requirement." RCW 13.34.136(2)(b)(i).

life[] and the department has not documented another reason why it would be otherwise appropriate to file a petition pursuant to this section." LAWS OF 2013, ch. 173, §§ 2(3), 3(4)(a)(iv). This provision includes a list of six factors that a dependency court "may" consider when "assess[ing] . . . whether a parent who is incarcerated maintains a meaningful role in the child's life." LAWS OF 2013, ch. 173, § 3(4)(b). The other provision allows the dependency court to consider incarceration-related barriers in "rebuttal" to the Department's allegation that "aggravated circumstances" justify an accelerated termination timeline. LAWS OF 2013, ch. 173, § 3(4)(c); former RCW 13.34.132(4)(g) (2012) (currently codified as RCW 13.34.132(4)(h)).[7]

Another provision in the 2013 law concerns parents with lengthy sentences. It states that the Department "should" consider alternatives to termination "such as, but not limited to, a guardianship," when such a parent "has maintained a meaningful role in the child's life" and a continued parent-child relationship is in the child's best interests. LAWS OF 2013, ch. 173, § 4(5).

Finally, the 2013 law addresses incarceration as it relates to the six factual findings, codified at RCW 13.34.180(1)(a)-(f), the trial court must make before

---

[7] Former RCW 13.34.132(4)(g) (2012) permits the court to forgo reunification efforts if, in a prior dependency, the parent failed to complete available services, this resulted in termination, and the parent has not made any significant change in the interim.

terminating a parent's rights. One provision says that the trial court "may" consider incarceration-related barriers in "rebuttal" to the presumption that arises under RCW 13.34.180(e) (that there is little likelihood that conditions will be remedied if a parent has not substantially improved his or her deficiencies in the last twelve months). LAWS OF 2013, ch. 173, § 4(1)(f)(2). The other provision requires the court to "consider" three things "[i]f the parent is incarcerated" before determining whether "continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home" (the sixth and final prerequisite to termination of parental rights under RCW 13.34.180(1)). LAWS OF 2013, ch. 173, § 4(1)(f). These mandatory "consider[ations]" are

> whether a parent maintains a meaningful role in his or her child's life based on [the] factors identified in [subsection 3(4)(b) of the new law]; whether the department or supervising agency made reasonable efforts as defined in this chapter; and whether particular barriers existed as described in [subsection 3(4)(b) of the new law] including, but not limited to, delays or barriers experienced in keeping the agency apprised of his or her location and in accessing visitation or other meaningful contact with the child.

*Id.*

Saint-Louis's first and primary challenge concerns the interpretation of this final provision—particularly the phrase "[i]f the parent is incarcerated." *Id.* She argues that this provision applied to her termination hearing even though she was not incarcerated when the hearing occurred.

Saint-Louis's second challenge implicates the interaction between two different provisions in the dependency statutes. One is RCW 13.34.180(1)(d), which requires the trial court to find that the Department "understandably offered or provided . . . all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future" before terminating a parent's rights. The other is SHB 1284's requirement that the permanency plan, "where possible," include services available at the facility where an incarcerated parent is confined. LAWS OF 2013, ch. 173, § 2(2)(b)(i). Saint-Louis contends that the Department failed to meet its obligation under these two statutes to make reasonable efforts to provide her with necessary services while she was in jail. She also argues that the Court of Appeals erred by refusing to address her reliance on the provision governing the permanency plan.

Saint-Louis's third challenge does not implicate the 2013 amendments. She argues that the evidence was insufficient to support two prerequisites to the termination of her parental rights (parental unfitness and little likelihood that she would remedy her parental deficiencies in the near future). In this court, she also asserts for the first time that the trial court impermissibly determined that her status as a domestic violence victim was a parental deficiency.

We reject all three challenges and affirm the Court of Appeals.

14

*Standard of Review*

In a dependency, as in any case, questions of statutory interpretation are reviewed de novo and factual findings are reviewed for substantial evidence in the record. *In re Dependency of K.D.S.*, 176 Wn.2d 644, 652, 294 P.3d 695 (2013). But because the State must prove its case in a termination proceeding by clear, cogent, and convincing evidence, that evidence must be "more substantial than in the ordinary civil case in which proof need only be by a preponderance." *In re Welfare of Hall*, 99 Wn.2d 842, 849, 664 P.2d 1245 (1983) (citing *In re Welfare of Sego*, 82 Wn.2d 736, 739, 513 P.2d 831 (1973)).

I.  Current RCW 13.34.180(1)(f) applies only when the parent is incarcerated at the time of the termination hearing; other parts of the 2013 amendments require the court to consider and make accommodations for a parent's prior incarceration

Generally, when the meaning of a statute is "plain on its face," a court must give effect to that meaning. *State v. Ervin*, 169 Wn.2d 815, 820, 239 P.3d 354 (2010) (quoting *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002)). Thus, we resort to other interpretive aids only when the plain language of a statute is ambiguous. *State v. Armendariz*, 160 Wn.2d 106, 110, 156 P.3d 201 (2007). This basic rule of statutory interpretation applies so long as it does not produce an absurd result.[8]

---

[8] *Tingey v. Haisch*, 159 Wn.2d 652, 663-64, 152 P.3d 1020 (2007).

The main statute at issue here is the provision in the 2013 amendment that requires the court to make three specific considerations "[i]f the parent is incarcerated" when determining whether "continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home" (the sixth and final prerequisite to termination of parental rights under RCW 13.34.180(1)). LAWS OF 2013, ch. 173, § 4(1)(f).[9] The State contends this provision is triggered only if the parent is incarcerated at the time of the termination hearing: "[T]he present tense phrase 'if the parent is incarcerated[]' refers to the time of the termination trial, not other stages." Suppl. Br. of Resp't at 11. Saint-Louis disagrees. She acknowledges that subsection 4(1)(f) is written in the present tense but argues that it is ambiguous about the "pertinent time point." Pet'r's Suppl. Br. at 10.

---

[9] As discussed above, these considerations are

> whether a parent maintains a meaningful role in his or her child's life based on [the] factors identified in [subsection 3(4)(b) of the new law]; whether the department or supervising agency made reasonable efforts as defined in this chapter; and whether particular barriers existed as described in [subsection 3(4)(b) of the new law] including, but not limited to, delays or barriers experienced in keeping the agency apprised of his or her location and in accessing visitation or other meaningful contact with the child.

LAWS OF 2013, ch. 173, § 4(1)(f).

We agree with the State. A statute is ambiguous if its plain language is susceptible to more than one reasonable interpretation. *Armendariz*, 160 Wn.2d at 110. The disputed provision requires the court to consider several factors "[i]f the parent is incarcerated" when it determines whether "continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home." LAWS OF 2013, ch. 173, § 4(1)(f) ("[i]f the parent is incarcerated, the court shall consider . . ."). According to the statute's plain terms, the "pertinent time point" is the point at which the court makes the "clearly diminishes" determination—and that occurs at the termination hearing. *Id.* There is no ambiguity in the statute's plain terms.

We also agree with the State that the legislature's use of the present tense in subsection 4(1)(f) appears to have been intentional. As the State points out, the 2013 amendment explicitly distinguishes, in several different provisions, between a parent's past and present incarceration. A parent's "current *or* prior incarceration" may rebut the State's allegation that aggravating circumstances justify an accelerated termination timeline, LAWS OF 2013, ch. 173, § 3(4)(c) (emphasis added); and the parent's "current *or* prior incarceration" may rebut the presumption that a parent who fails to substantially improve deficiencies within 12 months of the current dispositional order has little likelihood of remedying his or her deficiencies in the near future, LAWS OF 2013, ch. 173, §§ 4(1)(e), 4(2) (emphasis added). Most

17

relevant to Saint-Louis's argument, SHB 1284's "good cause" provision directs the court to consider whether "[t]he parent *is* incarcerated[] *or* the parent's *prior* incarceration is a significant factor in why the child has been in foster care . . . ." LAWS OF 2013, ch. 173, § 3(4)(a)(iv) (emphases added).

When the legislature uses different terms within the same statute, we presume that it intended different meanings. *Densley v. Dep't of Ret. Sys.*, 162 Wn.2d 210, 219, 173 P.3d 885 (2007). SHB 1284 uses three different phrases to refer to a parent's incarceration: "a parent's current . . . incarceration,"[10] "a parent's . . . prior incarceration,"[11] and "the parent is incarcerated."[12] These differences in wording support the State's interpretation of subsection 4(1)(f). They indicate that the legislature knew how to direct the termination court to consider a parent's prior incarceration, but chose not to do so in the provision that applies when the court considers the sixth and final statutory prerequisite to termination—whether "continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home." LAWS OF 2013, ch. 173, § 4(1)(f).

---

[10] LAWS OF 2013, ch. 173, § 3(4)(c).

[11] *Id.*

[12] LAWS OF 2013, ch. 173, §§ 2(2)(b)(i), 3(4)(a)(iv), 4(1)(f).

18

Saint-Louis (who maintains that the statute is ambiguous) argues that we must not "'rigidly appl[y]'" canons of construction to defeat the legislature's clear intent. Pet'r's Suppl. Br. at 12 (quoting *State v. Williams*, 94 Wn.2d 531, 538, 617 P.2d 1012 (1980)). And she contends that the legislature can't possibly have intended the State's interpretation of subsection 4(1)(f), since this interpretation would lead to "absurd and strained results . . . if the parent is released from . . . incarceration shortly before trial." *Id.* at 13. Saint-Louis urges us to avoid this result by reading the phrase "during the dependency" into subsection 4(1)(f): "Given the purpose of the act, the statute is more reasonably read to mean '[i]f the parent is incarcerated [during the dependency].'" *Id.* at 10.

As noted above, this court will avoid an absurd result even if it must disregard *unambiguous* statutory language to do so. *State v. McDougal*, 120 Wn.2d 334, 351-52, 841 P.2d 1232 (1992). But we must always apply this canon of construction "sparingly," consistent with separation of powers principles. *Five Corners Family Farmers v. State*, 173 Wn.2d 296, 311, 268 P.3d 892 (2011). The purpose of the "absurd results" canon is to prevent obviously inept wording from thwarting clear legislative intent. *Id.* We may not invoke that canon just because we question the wisdom of the legislature's policy choice. *Id.*

The plain language result in this case is not absurd. The provision at issue here relates to a forward-looking determination: whether "*continuation* of the parent

19

and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home." RCW 13.34.180(1)(f) (emphasis added). Without the protections afforded by SHB 1284, a court might conclude that a parent's incarceration alone necessarily satisfies this termination factor; our legislature might well have enacted SHB 1284 to prevent that result.[13]

Moreover, a parent's release from incarceration prior to the termination hearing does not make that incarceration irrelevant to the dependency or termination court's analysis. On the contrary, SHB 1284 either specifically requires or strongly suggests that the court must make special considerations, at three separate points prior to termination, when a parent was incarcerated during *any* part of the dependency.

First, when the court determines whether "there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future"—the fifth prerequisite to termination—it may not conclude that a parent's "actual inability . . . to have visitation with the child" due to incarceration "in and of itself" constitutes a failure to have contact with the child. RCW 13.34.180(1)(e)(iii). Indeed, this has been true since 2009, four years before SHB 1284 was enacted.

---

[13] *See* Br. of Amici Wash. Def. Ass'n et al. at 7 ("SHB 1284 was the legislature's response to the mounting social science . . . evidence that maintaining contact with one's incarcerated parent" improves outcomes for children and their families.).

LAWS OF 2009, ch. 477, § 5(1)(e)(iii). SHB 1284 altered this provision only by adding the words "current or prior" before the word "incarceration," clarifying that the termination court may not penalize a parent for his or her incarceration at any time during the dependency. LAWS OF 2013, ch. 173, § 4(1)(e)(iii). Thus, contrary to Saint-Louis's assertion, the termination court must always consider "whether [a recently released] parent experienced barriers during incarceration that impeded contact with the child." Pet'r's Suppl. Br. at 13. It just considers these barriers when ruling on the fifth prerequisite to termination (likelihood that reunification can occur in the near future) instead of the sixth.

The dependency court must also consider and accommodate incarceration-related barriers at the permanency planning hearing, when it determines whether to direct the Department to file a petition for termination. SHB 1284 provides that there is "good cause" to extend the termination deadline when

> [t]he parent is incarcerated, or the parent's prior incarceration is a significant factor in why the child has been in foster care for fifteen of the last twenty-two months, the parent maintains a meaningful role in the child's life, and the department has not documented another reason why it would be otherwise appropriate to file a [termination] petition . . . .

LAWS OF 2013, ch. 173, § 3(4)(a)(iv). (And, as noted above, the amendment also allows the dependency court to consider incarceration-related barriers in rebuttal to

the Department's allegation that "aggravated circumstances" justify an accelerated termination timeline. LAWS OF 2013, ch. 173, § 3(4)(c).)

Also contrary to Saint-Louis's assertion, SHB 1284 contemplates that the dependency court will consider "whether the parent tried to maintain a relationship with the child despite incarceration" during the dependency. Pet'r's Suppl. Br. at 13. In fact, the "good cause" provision in SHB 1284 contains a detailed list of factors that the court "may" consider in "assess[ing] . . . whether a parent who is incarcerated maintains a meaningful role in the child's life." LAWS OF 2013, ch. 173, § 3(4)(b). These are the same factors that the court must consider when applying current RCW 13.34.180(1)(f) (the disputed provision in this case).

Finally, SHB 1284 provides that the dependency court may consider incarceration-related barriers in rebuttal to the "presumption" that arises under RCW 13.34.180(1)(e) (that a parent's failure to improve parental deficiencies within 12 months of the dispositional order means there is little likelihood that reunification can occur in the near future). LAWS OF 2013, ch. 173, §§ 4(1)(e), 4(2).

To be sure, some of these provisions are only permissive—they allow, but do not require, the court to consider specific issues associated with a parent's incarceration prior to the termination hearing. Thus, they don't provide quite as much protection for parental rights as subsection 4(1)(f) does—though if counsel raises those issues, the court should certainly not disregard them without a good

22

reason. But this does not make the State's interpretation of subsection 4(1)(f) absurd. The termination court is still required to consider and accommodate a parent's *prior* incarceration before ruling on the fifth prerequisite to termination (likelihood that reunification can occur in the near future). And a parent can always argue that incarceration constitutes good cause to extend the termination deadline. LAWS OF 2013, ch. 173, § 3(4)(a)(iv).

For these reasons, we hold that subsection 4(1)(f) applies only when a parent "is incarcerated" at the time of the termination ruling.

II. The Department is required to provide all reasonably available services to incarcerated parents; the record shows that the Department did so

Saint-Louis argues that the Department failed to prove a necessary factual prerequisite to termination: that it "made reasonable efforts to offer . . . Saint-Louis services during her incarceration." Pet'r's Suppl. Br. at 17. Saint-Louis cites current RCW 13.34.136(2)(b)(i)(A) (subsection 2(2)(b)(i) of the 2013 amendment), which governs the contents of the permanency plan and provides in relevant part: "If the parent is incarcerated, the plan must address how the parent will participate in the case conference and permanency planning meetings and, where possible, must include treatment that reflects the resources available at the facility where the parent is confined."

23

In this case, the final updated permanency plan was entered about one week before Saint-Louis violated CCAP's requirements and was returned to jail for the first time. Perhaps because of this, Saint-Louis does not argue that the Department violated this provision directly. Instead, she argues that this provision, "read together" with RCW 13.34.180(1)(d) (the provision-of-services prerequisite to termination), "mean[s] that the Department must, where possible, provide all court-ordered and necessary services to incarcerated parents." Pet'r's Suppl. Br. at 16-17. And she contends that the record does not show reasonable efforts were made during her period of incarceration.

We disagree. As noted above, Livingston testified that she contacted the jail to inquire about services for Saint-Louis and learned that the only required service available was one-on-one mental health counseling. (Domestic violence classes were available, and Saint-Louis participated in them, but they were not required at that point.) Livingston's testimony on this issue was undisputed. Indeed, it was corroborated by Saint-Louis's testimony that the only people she knew in the jail's chemical dependency program were referred there by drug court. Thus, we reject Saint-Louis's argument that the Department violated any duty to provide services. The record shows the Department made reasonable efforts to refer her to the necessary services available in jail.

III.   The trial court's finding of parental unfitness is supported by substantial evidence

The Court of Appeals concluded that three parental deficiencies supported the trial court's finding of unfitness: "unresolved domestic violence issues, lack of parenting skills, and potential chemical dependency issues." *D.L.B.*, 188 Wn. App. at 922. Saint-Louis challenges all three conclusions.

First, she argues that "the risk that a child might be exposed to domestic violence is not a parental deficiency." Pet'r's Suppl. Br. at 19.[14] Saint-Louis relies on RCW 26.44.020(16), which defines "negligent treatment or maltreatment" for purposes of Washington's child abuse statute. RCW 26.44.020(16) provides that "[p]overty, homelessness, or exposure to domestic violence as defined in RCW 26.50.010 that is perpetrated against someone other than the child does not constitute negligent treatment or maltreatment in and of itself." Saint-Louis also argues that there was no evidence that her current partner had perpetrated domestic violence against her. Finally, Saint-Louis argues that there was no evidence she had a current

---

[14] Saint-Louis did not raise this argument in her motion for discretionary review, although she did challenge the trial court's factual finding of unfitness. Amici Washington Defender Association et al. raised this argument in their brief supporting review. We have discretion to address an issue raised only by amici. *See State v. Hirschfelder*, 170 Wn.2d 536, 552, 242 P.3d 876 (2010) ("[w]e need not address issues raised only by amici and decline to do so here"). We have declined to address such issues where they are inadequately briefed. *E.g.*, *State v. Gonzalez*, 110 Wn.2d 738, 752 n.2, 757 P.2d 925 (1988). But because this argument is thoroughly briefed, the record is sufficiently developed, and there is no disagreement among the parties as to the legal principles involved, we address it on the merits.

substance abuse problem and that her parenting deficiencies could be remedied in the near future by her participation in the Incredible Years program.

The record does not support any of Saint-Louis's arguments on parental fitness.

> A. Being the victim of domestic violence is not a parental deficiency: the Department has never advanced that position, and the trial court made no finding to that effect

The parties agree that being the victim of domestic violence is not a parental deficiency. And the trial court made no such finding in this case.

Instead, the trial court concluded (1) that Saint-Louis had a long-standing pattern of maintaining relationships with abusers, despite the risks that this posed for herself and D.L.B.; (2) that before participating in domestic violence classes, she maintained two such relationships in violation of no-contact orders (with D.L.B.'s father and with a boyfriend at the time D.L.B. was first placed in protective custody); (3) that Saint-Louis misrepresented crucial aspects of these relationships in her communications with the Department and that her sister and her therapist had to push Saint-Louis to take measures to protect herself from these men; (4) that she currently lived with and was pregnant by a man who had committed at least three documented domestic violence assaults between 1988 and 2010 and who violated a protection order in 2012; (5) that Saint-Louis was unemployed and 30 years younger than this man and that this man had never before had any children; (6) that Saint-

Louis hid her relationship with this man from the Department while pursuing reunification, even though she planned to move D.L.B. into his home; (7) that Saint-Louis's relationship with this man and decision to hide it from the Department raised concerns about "control issues and the potential for stress in the home as [Saint-Louis] plan[ned] for both [D.L.B.] and the expected newborn to be raised in [this man's] home," Clerk's Papers (CP) at 353 (Finding of Fact (FF) 2.17); and (8) that these facts damaged Saint-Louis's credibility and "indicate[d] an inability to put into practice what was taught/discussed at [the domestic violence] programs" in which Saint-Louis participated, CP at 354 (FF 2.19-2.21).

These findings were only part of the reason the trial court concluded Saint-Louis was unfit to parent D.L.B. The trial court also based that conclusion on its finding that Saint-Louis "demonstrated an unwillingness to participate in and/or successfully complete series [sic] offered to correct parental deficiencies." CP at 355 (FF 2.32). The trial court ultimately concluded that Saint-Louis had not made sufficient progress in addressing her chemical dependency issues, lack of parenting skills, or mental health concerns. *Id.* (FF 2.27).

Nothing in the trial court's conclusions amounts to a ruling that domestic violence victimization is a parental deficiency. To the extent that the trial court expressed domestic violence concerns, this reflected its reasonable doubts that Saint-Louis would protect D.L.B. from violence if she regained custody. Those doubts

27

stemmed in significant part from credibility assessments that are the province of the trial court.

Saint-Louis appears to be asking us to rule, as a matter of law, that her current relationship could not sustain any concerns about domestic violence unless the Department proved her boyfriend had perpetrated violence against Saint-Louis. We will not restrict the trial court's discretion in this way.

> B. The record supports the trial court's conclusions that Saint-Louis's chemical dependency and lack of parenting skills would not be remedied in the near future

The Department tried repeatedly to get Saint-Louis to provide 90 days of clean UAs. She repeatedly failed. First, she failed by missing several UAs despite knowing that the Department would regard these missed UAs as positive results.[15] Then, she failed by testing positive for alcohol in May 2013.[16] Finally, she failed by voluntarily relinquishing her work release privileges, even though she knew that she could provide UAs while on work release and could not provide them if she returned

---

[15] Livingston testified that the Department considers any missed or diluted UA to be positive for drugs or alcohol and that she or other department personnel explained this to Saint-Louis on "multiple occasions." 3 TR (July 30, 2014) at 397.

[16] At the termination hearing, Saint-Louis maintained that her only positive UA occurred after she went to a wedding in May 2013, where she had some champagne. She also claimed that she immediately reported this slipup to Livingston. Livingston disagreed with this narrative. She testified at the termination trial that Saint-Louis tried to lie about the positive UA and had already missed several UAs prior to that slipup (a total of at least six between January and May 2013).

to total confinement. All of this is evidence that Saint-Louis had not remedied her chemical dependency problem in the more than two years that had elapsed between the initial dependency order on May 11, 2012, and the termination hearing in late July 2014. Her failure to remedy this problem in two years supports the trial court's conclusion that she was unlikely to do so in the near future.

With respect to the Incredible Years program, the record shows a similar inability to achieve compliance. Saint-Louis was referred to that program four times but never completed more than a few classes. Her initial failure to enroll may have been excusable: testimony at the termination hearing indicated that there were not enough students to hold the program at that point and that when classes did become available in early 2013, they conflicted with Saint-Louis's work schedule. But when Saint-Louis did finally enroll, sometime after August 2013, she was discharged for missing four classes. When Saint-Louis was on work release in April 2014, Livingston again tried to refer her to the Incredible Years program; that effort failed because Saint-Louis voluntarily relinquished her work release privileges. Nothing in the record indicates that Saint-Louis's fifth attempt to complete the Incredible Years program would be more successful than the four prior attempts.

The trial court's factual findings on chemical dependency and parenting skills are supported by substantial evidence. There is no basis to disturb its conclusion that Saint-Louis was unfit to parent D.L.B.

## CONCLUSION

We hold that current RCW 13.34.180(1)(f) (LAWS OF 2013, ch. 173, § 4(1)(f)) applies only when a parent "is incarcerated" at the time of the termination hearing. We reject Saint-Louis's other challenges because the record provides substantial support for the trial court's findings, even under the heightened standard of review that applies to decisions terminating a parent's rights. We therefore affirm.

_[signature] Gordon McCloud, J._

WE CONCUR:

_[signature] Madsen, C.J._

_[signature] Johnson, J._

_[signature] Owens, J._

_[signature] Fairhurst, J._

_[signature] Stephens, J._

_[signature] Wiggins, J._

_[signature] González, J._

_[signature] Yu, J._

31