IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Welfare of | ) | No. 37601-0-III |
| | ) | |
| | ) | |
| | ) | UNPUBLISHED OPINION |
| C.A.[†] | ) | |
| | ) | |
| | ) | |

LAWRENCE-BERREY, J. — S.D. appeals after the trial court terminated her parental rights to her son, C.A. She argues the Department of Children, Youth, and Families (Department) did not provide her the necessary court-ordered services, it failed to prove that termination was in C.A.'s best interest, the termination statute is unconstitutional as applied, and various findings of fact should be vacated. We disagree and affirm the termination order.

---

[†] To protect the privacy interests of the minor, we use initials to refer to him and his mother throughout this opinion. Gen. Order for Court of Appeals, *In Re Changes to Case Title* (Wash. Ct. App. Aug. 22, 2018) (effective Sept. 1, 2018), http://www.courts.wa.gov/appellate_trial_courts.

No. 37601-0-III
*In re Welfare of C.A.*

FACTS

In March 2017, S.D. contacted the Department and requested an out-of-home placement for her eight-year-old son, C.A. The Department responded by providing voluntary services to the family, including a parenting program and Intensive Family Preservation Services. At the time, S.D. was already engaged in individual mental health services with Leah Parker at the Children's Home Society.

The Department learned C.A. was missing school. It also learned C.A. was acting out, destroying property, and running away from home. As punishment, S.D. would lock C.A. out of their apartment, which forced him to sleep in the laundry room of the apartment complex.

In November 2017, C.A. reported that his mother choked him and threatened to kill him. Law enforcement took C.A. into protective custody. The Department investigated, determined that the report was unfounded, and attempted to return C.A. to S.D. with voluntary supportive services. S.D. refused and said she had "dealt with him long enough" and "the Department can deal with him now." Report of Proceedings (RP) at 88.

The Department filed a dependency petition on November 27, 2017. S.D. agreed to a finding of dependency as well as to an order authorizing out-of-home care for C.A.

2

No. 37601-0-III
*In re Welfare of C.A.*

S.D. further agreed to participate in a psychological evaluation, a parent/child assessment, mental health counseling, and family therapy.

*Psychological evaluations*

S.D. completed two psychological evaluations over the course of the case, one with Dr. Scott Mabee and one with Dr. Noelle Turner. Dr. Mabee recommended six months of counseling to build skills necessary for coping with depression and anxiety and to become less avoidant and reactive. He further recommended medication management, a parenting program such as the Positive Parenting Program, the Behavioral and Educational Skills Training (BEST) program for C.A., and an in-home family preservation service if C.A. returned to live with his mother. Dr. Turner diagnosed S.D. with major depressive disorder, posttraumatic stress disorder, and attention deficit hyperactivity disorder.

*Mental health counseling*

S.D. worked with two different mental health providers during the dependency. She worked with Leah Parker at the Children's Home Society for two years beginning in September 2017. Ms. Parker provided S.D. with Cognitive Behavioral Therapy (CBT) to help with emotion regulation to provide more consistent parenting. Ms. Parker believed that S.D. was making progress in regulating her emotions. However, she also felt that

3

S.D. needed more assistance and referred S.D. for other services including medication management, psychological testing, and peer support, as well as talking with S.D. about intensive outpatient mental health treatment that would have included Dialectical Behavior Therapy (DBT). She recommended DBT because that type of therapy would be "useful in helping someone regulate their emotions and have interpersonal effectiveness, which were a struggle for [S.D.]." RP at 159.

Ms. Parker would have made the referral for intensive outpatient treatment and DBT to Frontier Behavioral Health because Frontier provided the most extensive services, but S.D. refused because she had a history with Frontier and did not want to return there. S.D. did not request a different provider or show interest in the services offered.

Following a disagreement between S.D. and Ms. Parker, S.D indicated that she wanted to close the service. Ms. Parker provided a discharge summary to S.D., recommending intensive outpatient treatment and additional parenting skills training. The summary included instructions for requesting the recommended services.

S.D. had three sessions with counselor Mary Anne Sacco beginning in November 2019. After a series of starts and stops, Ms. Sacco felt that S.D. needed a different level of mental health treatment and recommended DBT because a DBT therapist would be

4

available for S.D. to call or text for help in a crisis. Ms. Sacco offered referrals for DBT

and additional services through Frontier or an alternative provider, but S.D. declined.

The Department offered a referral to a third counselor, Carla Paullin, who could

have offered Eye Movement Desensitization and Reprocessing (EMDR) therapy, but S.D.

declined.

*C.A.'s placements and behaviors*

Meanwhile, C.A. went through nine different placements and two psychiatric

hospitalizations before ending up in a foster home in Yakima. During the various

placements, C.A.'s behavioral issues continued, including damaging property, running

away, assaulting staff, and other disruptive behaviors. These behavioral issues stabilized

once C.A. was placed in the Yakima foster home.

*Parenting assessment and parent-child interactions*

S.D. completed a parenting assessment with Caitlin Soriano on February 14, 2018.

Ms. Soriano found that S.D. and C.A. had a significant relationship but that they had "a

difficult time communicating with each other and working through difficult situations."

RP at 337. Ms. Soriano recommended family therapy for the two of them, as well

as a psychological evaluation for S.D. and individual counseling for S.D. and C.A.

S.D. and C.A. began having therapy sessions together, but the two often had issues with

5

one another during the sessions. In August 2018, S.D. suddenly ended the therapy sessions because she was upset that Ms. Soriano had not returned a telephone call and because of a dispute about C.A. receiving a Game Boy, leading S.D. to believe that Ms. Soriano did not care about her.

*Family therapy and parent-child interactions*

The Department next referred S.D. to Kristin Kempf for additional family therapy; however, this service ended abruptly during introductory sessions when S.D. refused to accept Ms. Kempf's ground rules for therapy and when S.D. called Ms. Kempf a "bitch." RP at 456.

In May 2019, the Department filed a petition to terminate S.D.'s parental rights. C.A.'s foster parents offered S.D. an open adoption plan so as to preserve a relationship between C.A. and S.D., but S.D. refused the offer.

Around this time, S.D. and C.A. began family therapy with Dr. James Maxson in Yakima. The Department assisted S.D.'s travel from Spokane to Yakima by providing her bus tickets, or new tires for her car and gas vouchers. S.D.'s participation in family therapy became sporadic, with her not showing up or suddenly canceling before the session. This caused C.A. to become frustrated, and he then refused to go to sessions as well. In October or November 2019, S.D. stopped traveling to Yakima to visit C.A.

6

No. 37601-0-III
*In re Welfare of C.A.*

*Termination trial*

The four-day termination trial began in Spokane on March 2, 2020. S.D. did not attend the first day of trial and appeared sporadically thereafter. She testified in the Department's case-in-chief. But despite being advised she would testify in her own case-in-chief on March 5, she did not attend that day. The court granted the Department's petition and entered a termination order on April 30, 2020.

S.D. timely appealed.

## ANALYSIS

SERVICES NECESSARY FOR REUNIFICATION

S.D. contends the Department did not offer her all services necessary for reunification. She argues the Department failed to provide her with DBT, EMDR, and Cognitive Processing Therapy (CPT). We conclude that the trial court's finding that these services would have been futile is a verity.

A trial court may terminate parental rights only if it finds six requisite elements are supported by clear, cogent, and convincing evidence. RCW 13.34.180(1); *In re Parental Rights to D.H.*, 195 Wn.2d 710, 718, 464 P.3d 215 (2020). Among these elements is "[t]hat the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available,

7

capable of correcting the parental deficiencies within the foreseeable future have been

expressly and understandably offered or provided." RCW 13.34.180(1)(d).

A "necessary service" is a service "'needed to address a condition that precludes

reunification of the parent and child.'" *In re Parental Rights to K.M.M.*, 186 Wn.2d 466,

480, 379 P.3d 75 (2016) (quoting *In re Dependency of A.M.M.*, 182 Wn. App. 776, 793,

332 P.3d 500 (2014)). The trial court specifically ordered the Department to provide S.D.

with DBT. Moreover, a psychologist who evaluated S.D., Dr. Nathanael Corduan,

recommended that S.D. receive EMDR and CPT.

The trial court nevertheless found that these and other services described by Dr.

Corduan would have been futile. In the second half of finding of fact V,[1] the court

explained the evidence that led to this finding:

> Dr. Courdon indicated that [S.D.] could have benefitted from reading
> materials on the parent/child attachment dynamic, attachment formation,
> EMDR, exposure therapy, CPT, and intensive outpatient services including
> dialectical behavioral therapy concepts . . . . His testimony was clear that
> [S.D.] would need at least a minimal level of emotional regulation and
> coping skills before she could be successful in EMDR, intensive outpatient,
> or DBT.[2]

---

[1] Finding of fact V contains 62 lines of typed text. We quote less than one-half of it.

[2] At trial, the following exchange occurred:

> [DEPARTMENT:] . . . Would a person need to have at least a
> minimal level of emotional regulation or coping skills before they could be

In family therapy services there was a consistent theme of referrals and re-referrals to multiple providers, all of which ended poorly, were rejected, or [S.D.] disengaged.  This happened with every provider from beginning to end.  [The court then provides several examples which substantiate the prior sentence].

The mother engaged in mental health counseling with Leah Parker and Mary Ann Sacco. . . .  Ms. Parker was unable to make progress with [S.D.] on trauma work, explain modalities, or on deficiencies because sessions were focused on day-to-day issues that [S.D.] was concerned with.  [S.D.] argued [in closing] that she should have been provided with DBT services and intensive inpatient mental health treatment, *however the testimony was clear that getting [her] mental health stabilized was necessary before those services would be successful.  If they wouldn't be successful without stabilization, it would be futile and wouldn't be capable of correcting parental deficiencies.  [S.D.'s] failure to address her underlying mental health issues [was a result of her] disengaging with service providers when she disagreed with something they said or when they wouldn't do something she wanted them to do.  This made further services such as DBT and intensive inpatient treatment futile.*

Clerk's Papers (CP) at 166-67 (emphasis added).

In her opening brief, S.D. assigned error to finding of fact V.  Nothing in her opening brief—the issue raised in conjunction with her challenge to the finding or her argument—takes issue with the quoted portion of the above finding.  Specifically, S.D.

---

successful in either EMDR or intensive outpatient or DBT?

[DR. CORDUAN:]  Absolutely.  The first thing that we do when we engage in *any kind of therapy that's focused on trauma* in particular is we have to focus on the basic emotion regulation skills . . . .  Because if you engage in the trauma, you can have someone disassociate and become, you know, either belligerent or, you know, cause further re-traumatization or disassociation.

did not assign error to or address the trial court's finding that offering therapies that

required a basic level of emotional regulation would have been futile.  An unchallenged

finding is a verity on appeal.  *In re Estate of Jones*, 152 Wn.2d 1, 8, 93 P.3d 147 (2004).

Not until her reply brief does S.D. argue against the trial court's finding that offering the

challenged services[3] would have been futile.

When an appellant fails to address an issue in an assignment of error or in the

substance of the appellant's brief, the potential prejudice to the respondent if the appellate

court were to address the issue can constitute compelling reasons for the appellate court

not to exercise its discretion under RAP 1.2(a) to overlook the procedural error.

*SentinelC3, Inc. v. Hunt*, 181 Wn.2d 127, 138 n.4, 331 P.3d 40 (2014).  Here, S.D. did not

challenge the trial court's futility finding either as an assignment of error or in her

opening brief.  For this reason, the Department did not address this issue in its responsive

brief.  The Department would be prejudiced were we to exercise our discretion here and

overlook S.D.'s procedural error.  Moreover, an appellate court will not address an issue

first raised in a reply brief.  *In re Marriage of Bernard*, 165 Wn.2d 895, 908, 204 P.3d

---

RP at 262 (emphasis added).

[3] Finding V expressly addresses DBT and EMDR, but does not expressly address CPT.  But Dr. Corduan's testimony (italicized in the prior footnote), and the broad language used in finding V (underlined toward the end of quote), lead us to construe the finding as encompassing CPT.

No. 37601-0-III
*In re Welfare of C.A.*

907 (2009). For these reasons, we will treat the above-quoted portion of finding of fact V as a verity.

Washington courts recognize the futility doctrine when it comes to the Department's obligation to offer services. "The futility doctrine allows the trial court to terminate parental rights if either (1) the services would have been futile when offered or (2) offering the services would not remedy the parental deficiencies within the child's foreseeable future." *In re Parental Rights to D.J.S.*, 12 Wn. App. 2d 1, 24, 456 P.3d 820 (2020). As explained below, the record supports a finding that offering the services would not remedy S.D.'s parental deficiencies within the child's foreseeable future.

In the penultimate paragraph of finding of fact VI, the trial court found:

> [S.D.] admitted in her testimony that she was not currently in a position for [C.A.] to come home. She did not have any idea how long it would be before she was emotionally ready for [C.A.] and suggested it may take about a year for her to become ready. Due to [S.D.'s] lack of progress toward reunification for the last two years of dependency, and [S.D.'s] estimate that it may take her another year to be ready, the court finds that there is little likelihood of reunification in the near future.

CP at 171.

S.D. challenges this finding and asserts it is not supported by substantial evidence. We disagree. The trial court's summary of S.D.'s testimony is accurate. Also, the trial court noted that S.D. had not progressed despite a lengthy dependency. By statute,

11

"[a] parent's failure to substantially improve parenting deficiencies within twelve months following entry of the dispositional order shall give rise to a rebuttable presumption that there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." RCW 13.34.180(e).

S.D. argues, "A short period of intensive outpatient treatment in DBT would have increased the likelihood that conditions would be remedied, allowing a return home." Appellant's Br. at 24. We are unpersuaded by this argument because it ignores the second portion of finding V. There, the trial court found that S.D. could not undertake DBT until she improved her emotional regulation and coping skills. It additionally found that S.D.'s repeated disengagement with services prevented her from gaining these necessary skills for her to begin services such as DBT.

In conclusion, we affirm the trial court's application of the futility doctrine that excused the Department from offering or providing S.D. with DBT, EMDR, and CPT.

BEST INTEREST OF C.A.

S.D. contends the Department failed to prove that termination of the parent-child relationship was in the best interest of C.A. She argues that the evidence showed that termination would be potentially harmful for C.A. and that the Department failed to show removal was necessary. We disagree.

12

A trial court must first find that all of the elements in RCW 13.34.180 are satisfied before terminating a parent-child relationship. Once the trial court has found these elements to be satisfied, it must then find whether, by a preponderance of the evidence, termination is in the best interest of the child under RCW 13.34.190(1)(b). *In re Welfare of A.J.R.*, 78 Wn. App. 222, 228, 896 P.2d 1298 (1995). Where a parent is unable to or unwilling to make progress over a length of time, the trial court may find termination is in the best interest of the child. *In re Dependency of T.R.*, 108 Wn. App. 149, 167, 29 P.3d 1275 (2001).

Where the trial court has weighed the evidence, this court only reviews whether the trial court's findings were based on substantial evidence. *In re Dependency of D.L.B.*, 188 Wn. App. 905, 914, 355 P.3d 345 (2015), *aff'd*, 186 Wn.2d 103, 376 P.3d 1099 (2016). "'Substantial evidence is evidence in sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise.'" *Id.* (internal quotation marks omitted) (quoting *In re Welfare of T.B.*, 150 Wn. App. 599, 607, 209 P.3d 497 (2009)).

S.D.'s argument relies on the recommendation of C.A.'s counselor who testified that C.A. and S.D. share a very important bond and that ending contact between C.A. and

13

S.D. would be detrimental to C.A.  But this selected testimony does not truly reflect the evidence presented at trial.

During the three years between when the dependency began and the termination trial, S.D. has withdrawn more and more from C.A.  She saw C.A. intermittently in September and October 2019, and she last saw him in November of that year, four months before the termination trial.  At trial, S.D. admitted she was emotionally unready to care for C.A.

Meanwhile, C.A. has been through numerous placements in homes and psychiatric hospitals.  He finally adjusted to a foster home with a couple willing to adopt him and give him a sense of permanence.  C.A.'s counselor testified that it is detrimental for C.A. to be left in this state of limbo, unsure where his home is going to be.  Termination and allowing adoption to move forward would give C.A. permanence.  We conclude the evidence is sufficient to persuade a fair-minded, rational person that it is in C.A.'s best interest for his relationship with S.D. to be terminated.

CONSTITUTIONALITY OF THE TERMINATION STATUTE

S.D. contends that chapter 13.34 RCW (hereafter the "termination statute") is unconstitutional as applied to this case.  She argues it only allows the trial court to make an all or nothing ruling, either terminating the parental rights entirely or leaving them as

14

is.  She further contends this is not narrowly construed for the best interest of C.A.  We disagree.

Washington courts recognize that the biological parent of a child has a fundamental liberty interest in the continuing custody of their child.  *In re Welfare of M.R.H.*, 145 Wn. App. 10, 29, 188 P.3d 510 (2008).  While this right is fundamental, it is not absolute and when a parent's actions endanger the child, the Department has both the right and obligation to step in.  *Id.*  Under RCW 13.34.180 and RCW 13.34.190, a trial court may terminate the parent-child relationship where it finds (1) the required allegations are supported by clear, cogent, and convincing evidence, and (2) the child's best interest is served by termination of the parent-child relationship.  *M.R.H.*, 145 Wn. App. at 29-30.

S.D. argues here that the evidence showed that a less restrictive alternative to full termination would have been in C.A.'s best interest.  However, as we held in *M.R.H.*, it is not a requirement for the trial court to consider guardianship or open adoptions as a less restrictive alternative if no petition for such has been filed.  *Id.* at 31.  Here, the foster parents looking to adopt C.A. did offer S.D. an open adoption plan, but she refused.

Further, the court previously examined a similar argument in *In re Dependency of M.-A.F.-S.*, 4 Wn. App. 2d 425, 421 P.3d 482 (2018).  In *M.-A.F.-S.*, a father who had his

parental rights terminated argued the termination statute was unconstitutional as applied because where an adoption is not imminent it is not the least restrictive means of protecting the child. *Id.* at 449-50. The father argued the Department could have simply terminated his right to object to an adoption and allowed contact once the parent had healed their own problems. *Id.* at 453. The court rejected these arguments, in part because termination already required a finding that continuation of the parental relationship is harmful to the child. *Id.*

Similarly here, the trial court made a finding that the continuation of the parent-child relationship would be harmful to C.A. It did not need to seek out an alternative arrangement in order to try and preserve this relationship. We conclude that the termination statute is narrowly construed in order to best serve the interest of the child.

OTHER FINDINGS OF FACT NOT SUPPORTED

S.D. contends that portions of the trial court's findings of fact V through IX and XII must be vacated either because they are not supported by substantial evidence or because they contain conclusions of law. To the extent that any of the challenged findings impact the issues raised by S.D. on appeal, we have addressed them. To the extent S.D.'s challenges are merely technical, they do not impact our resolution of the case and we do not address them.

No. 37601-0-III
*In re Welfare of C.A.*

Affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Lawrence-Berrey, J.

WE CONCUR:

_____        _____
Pennell, C.J.                                         Siddoway, J.

17