# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Dependency of | ) | No. 76150-1-I |
| | ) | |
| D.F.-S., | ) | |
| DOB: 03/29/2004, | ) | DIVISION ONE |
| | ) | |
| Minor Child. | ) | UNPUBLISHED OPINION |
| | ) | |
| STATE OF WASHINGTON, | ) | |
| DEPARTMENT OF SOCIAL AND | ) | |
| HEALTH SERVICES, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| L.S., | ) | |
| | ) | |
| Appellant. | ) | FILED: October 2, 2017 |
| | ) | |

2017 OCT -2 AM 9: 51 COURT OF APPEALS DIV I STATE OF WASHINGTON FILED

TRICKEY, J. – Following successive dependencies during which L.S. made little progress with services, the superior court terminated his parental rights to his son, D.F.-S. L.S. appeals, arguing the Department of Social and Health Services (Department) failed to satisfy the statutory prerequisites to termination. Because the Department met its burden, we affirm.

## FACTS

### Pretrial History

L.S. is the biological father of D.F.-S, born March 29, 2004. In 2005, the Department learned that D.F.-S.'s parents left him with inappropriate caregivers. His mother voluntarily engaged in services and D.F.-S. was returned to her care.

In 2007, the Department learned that D.F.-S.'s parents were leaving him unsupervised and that drug charges were pending against L.S. The Department removed

D.F.-S. and the parents entered agreed orders of dependency. The order relating to L.S. required him to participate in parenting classes, a substance abuse evaluation, and random urinalysis (UAs). He participated in a substance abuse evaluation but by 2009 was no longer complying with services. The court dismissed the dependency, however, because D.F.-S.'s mother made sufficient progress to return him to her care.

In July 2013, the Department again removed D.F.-S. because his parents had abandoned him. A family friend who retrieved D.F.-S. described the home as "filthy with cat feces . . . and spoiled food and garbage on the floors and counters."[1] The Department filed and served another dependency petition. L.S., however, did not participate in the early stages of the proceedings. He told the Department he was mourning the death of his eldest son "and could not care for [D.F.-S.]"[2]

In September 2013, the court entered default orders of dependency as to both parents. The order relating to L.S. alleged in part as follows:

> 2. The mother and father continue to show a pattern of relapsing and being inconsistent in the child's life. The current caregiver reports that this is the fifth time that she has had [D.F.-S.] in her care and that each time he becomes more withdrawn and detached. She further describes him as "desensitized" to the absence of his parents and increasingly unaffectionate. In addition to the vulnerability that his age presents, [D.F.-S.'s] primary caretaker, his brother Brandon Williams, was shot and killed in May, 2013.

> 3. The mother and father have extensive Child Protective Services (CPS) history. . . .

> . . . .

---

[1] Clerk's Papers (CP) at 272 (Findings of Fact (FF) 2.3.3).
[2] CP at 273 (FF 2.4).

5. On 7/3/13, [L.S.] told the Department that he was in mourning and could not care for his son at this time. [He] has not seen his son since 6/12/13. [He] did not deny his current use of crack cocaine.

6. On 7/8/13, [the mother] attended a Family Team Decision Making Meeting (FTDM). . . . Mother refused to do a UA and later admitted to actively using crack cocaine. [L.S.] did not attend the FTDM.

7. [The parents'] pattern of behavior shows a serious disregard for the consequences to [D.F.-S.] of such magnitude that it creates a clear and present danger to the child's health, welfare and safety. The family situation results in no adults in the home performing child [c]are duties and responsibilities to assure the child's safety.[3]

The order required L.S. to complete a drug and alcohol evaluation "within 30 days" and follow any recommended treatment, submit to random UAs, and schedule a psychological evaluation with a parenting component "within 30 days" and initiate all recommended treatment "promptly."[4]

During the following two and a half years, dependency review and permanency planning orders indicated that L.S. was not complying with services or making progress.

In February 2015, L.S. entered the King County Jail on a charge of possessing cocaine. In June 2015, he pleaded guilty and remained in the jail until his transfer to the Washington Corrections Center in Shelton in October 2015. In December 2015, the Department transferred him to the Cedar Creek Correctional Facility. He is eligible for work release in June 2018.

In March 2016, a permanency planning order indicated that L.S. had completed a drug/alcohol assessment while incarcerated.

---

[3] Ex. 1
[4] Ex. 1.

In April 2016, the Department filed a petition to terminate both parents' parental rights. The petition alleged that neither parent had complied with service requirements or remedied their parental deficiencies. Trial commenced in October 2016.

### Trial Testimony

Social worker Alyssa Livingston testified that she was assigned to D.F.-S.'s dependency in the fall of 2013. According to Livingston, the parents, who were homeless, abandoned D.F.-S. at a funeral for L.S.'s eldest son and "disappeared for weeks" without leaving any contact information.[5]

Livingston testified that L.S. did not appear at the initial Family Team Decision Making meeting. The mother attended the meeting and admitted that she and L.S. were using crack cocaine.

L.S. did not contact Livingston until April 2014. Livingston provided him a copy of the dependency order and tried to explain his services and visitation rules. L.S. angrily threw the dependency order at Livingston and said "that essentially he wasn't going to do anything and he felt like this was unnecessary."[6] He then "stormed out of the room" and returned only to sign the visitation rules.[7] Livingston testified that she offered L.S. his court-ordered services, but he "was not interested in doing UAs or a psychological evaluation. The only thing he was interested . . . in doing [was] the drug and alcohol evaluation."[8] Livingston said she stressed "the importance of keeping in communication

---

[5] 2 Report of Proceedings (RP) at 164.
[6] 2 RP at 156.
[7] 2 RP at 156.
[8] 2 RP at 174-75.

so that [she would] know what services they might be doing and . . . so we can do visitation" but the parents left invalid contact information.[9] L.S. "didn't remain in contact" or engage in any services.[10]

When asked if L.S. ever contacted her after their initial meeting, Livingston said he came by on another occasion and told her he would get an alcohol evaluation at the Indian Health Board. "[B]ut beyond that there was no conversation or anything about him following through with the recommended services."[11] Livingston and L.S. agreed that since no referral was necessary for the Indian Health Board service, L.S. would initiate that service on his own and notify Livingston when it was completed. Livingston did not believe L.S. could safely parent D.F.-S. without addressing his substance abuse.

Livingston testified that L.S. only requested one visit with D.F.-S. while she was assigned to the case. That visit occurred in May 2015.

Pamela Rago, the second caseworker assigned to D.F.-S.'s dependency, replaced Livingston in September 2015. At that time, L.S. was incarcerated in the King County Jail. Rago testified that none of his court-ordered services were available in the jail, but she did arrange a visit with D.F.-S.

When L.S. moved temporarily to the Washington Corrections Center in Shelton in October 2015, Rago sent him service letters and copies of the dependency and dependency review orders. She continued to send him service letters when he moved to

---

[9] 2 RP at 161.
[10] 2 RP at 163.
[11] 2 RP at 158.

the Cedar Creek Corrections Center in December 2015. The letters listed the offered services and the status of D.F.-S. and the court proceedings.

Shortly after L.S. arrived at Cedar Creek, Rago contacted the Department of Corrections (DOC) about providing him with court-ordered services and visitation. DOC agreed to perform an alcohol and drug assessment. Although DOC would not perform the psychological evaluation, it authorized the Department to bring in its own evaluator. DOC also indicated it would not perform UAs until a few months before L.S.'s release.

In February 2016, DOC performed a chemical dependency assessment and concluded L.S. suffered from alcohol and cocaine dependence. The substance abuse recovery unit supervisor recommended that he receive level 3.5 inpatient treatment. It is undisputed that level 3.5 treatment is not available at DOC, that Cedar Creek only offers up to level 2.1 treatment, and that level 3.3 treatment was available in another DOC facility.

In a letter dated February 25, 2016, Rago updated L.S. on the status of his services:

> I understand that you have already had your Drug and [A]lcohol assessment. I have been in contact with your attorney and have given her two contracted professionals who may possibly be able to do your Psychological Evaluation. I have contacted other providers but they do not want to travel to Cedar Creek. I will be requesting your Drug and Alcohol assessment from the Public Records Officer/Public Disclosure Unit/ Department of Corrections once I receive the Consent form back from you. I am enclosing the consent form for you to sign and have enclosed a postage paid envelope for you to mail it back to me.[12]

---

[12] Ex. 26.

6

On March 8, 2016, Rago sent the signed consent form to DOC and requested a copy of L.S.'s chemical dependency assessment.

By letter dated May 10, 2016, Rago again updated L.S. on her efforts to provide him services:

> I received your Chemical Dependency evaluation from DOC and sent your attorney a copy. According to the evaluation the recommendation is for you to participate in 3.5 Clinically Managed High-Intensity Residential Services. I contacted DOC on 4/14/16 to inquire if the DOC would be able to provide you with this service while you are at Cedar Creek and was informed that the DOC does not provide level 3.5 services in any of their facilities and you will need a referral to a residential treatment program when you are released from prison.
>
> Your attorney and I have agreed upon a provider to conduct your psychological evaluation with a parenting (measure) component. I will be making that referral shortly.[13]

On May 20, 2016, Rago wrote a referral to Dr. Steve Tutty, who in turn scheduled a psychological evaluation at Cedar Creek for July 2016. The evaluation eventually took place in early August 2016.

Rago testified that D.F.-S. initially agreed to speak with L.S. by phone so she put money in L.S.'s account to pay for phone calls. D.F.-S. soon changed his mind, however, and declined further contact with L.S.

Rago testified that D.F.-S. is adoptable and could not be reunited with L.S. in the foreseeable future, especially given D.F.-S.'s desire to not have contact with his father. Rago stated that D.F.-S. "deserves to know what the next step is. He's in middle school. He's starting to think about college, what his plans are for the future and if there was . . .

---

[13] Ex. 26.

possible reunification throughout the time it's a very vulnerable time in a young teenager's life."[14] Rago concluded that termination was in L.S.'s best interests.

On cross-examination, Rago conceded she did not ask the King County Jail whether it would provide court-ordered services but said it was her understanding that the jail would not. She also conceded she did not ask DOC if UAs could be performed by someone other than DOC personnel. Rago denied receiving any request from L.S. or his attorney for family counseling services. She conceded she never offered such services, but explained it would not be effective since D.F.-S. did not want to have contact with L.S.: "I believe that the child needs to want . . . family counseling in order for it to be effective so he would be able to participate fully."[15] If one family member does not want to be in family counseling, "[n]o progress is being made, it's one-sided."[16]

Deborah Turner, the Court Appointed Special Advocate (CASA) for D.F.-S., testified that termination was in his best interests. She noted that D.F.-S. wanted to live with his foster parents, not L.S. She concluded L.S. was incapable of providing adequate care for D.F.-S., stating:

> I don't believe that [L.S.] understands the very basic need of a child to have consistency or structure . . . from the parent in his life. And I don't get the sense that [L.S.] comprehends the damage to [D.F.-S.] that has come from his life choices and the neglect and abandonment in this case. I don't think . . . he has the maturity to parent [D.F.-S.] through some of the difficult times, the psychological and emotional journey that he has and will have to go through. And even just an adolescent and a teenager.[17]

---

[14] 3 RP at 290-91.
[15] 3 RP at 322-23.
[16] 3 RP at 322.
[17] 3 RP at 344-45.

She added that D.F.-S. "deserves to be able to live in the present and in the future and know what's going to happen. And I think he deserves the life that comes from knowing that you're going to be safe, that you're going to have reasonable expectations and . . . responsibilities as a part of a family."[18]

Dr. Tutty testified that he performed L.S.'s psychological evaluation at the Cedar Creek facility in August 2016. Dr. Tutty diagnosed L.S. with amphetamine and alcohol use disorders and paranoid personality disorder. Testing showed L.S. at high risk to negligently "endanger the child's safety and welfare."[19] When asked if L.S. could safely parent D.F.-S., Dr. Tutty stated that "the risk factors are just too high in this case."[20] He testified that L.S. "does not appear to be amenable to treatment" of any kind due to his "high levels of paranoia, his history of recidivism, [and] his lack of insight and judgment."[21] He believed reunification could not be considered until L.S. completed intensive residential chemical dependency treatment and demonstrated sobriety for at least 18 months following his release. Dr. Tutty pointed to drug use literature indicating that the risk of relapse drops significantly when sobriety lasts 12 or more months. Dr. Tutty also recommended counseling for personality disorder by someone skilled in cognitive behavioral therapy (CBT) and interpersonal treatment, a parent coach to improve the bond between L.S. and D.F.-S. "[i]f the Department elects to proceed with reunification

---

[18] 3 RP at 346.
[19] 2 RP at 197.
[20] 2 RP at 199-200.
[21] 2 RP at 200, 208.

upon [his] release," and completion of "the Triple P program" upon release given L.S.'s "high child abuse risk . . . and the neglect surrounding his current dependency."[22]

On cross-examination, Dr. Tutty testified that L.S.'s responses during testing did not show rigidity in his definition of the parent role. They also did not show tendencies toward corporal punishment or excessive restriction of children's independence. The testing showed no deficits in problem solving or decision-making.

Mental health therapist Mollie Wirtz testified that D.F.-S.'s foster parents asked her to provide therapy for D.F.-S. in the fall of 2015. They met 18 times over the next year. D.F.-S. was not willing to talk about his father during their sessions and expressly declined an offer to facilitate monthly phone calls and visits with his father. Wirtz conceded she never asked D.F.-S. if he wanted family therapy to repair his relationship with his father. She testified, however, that successful family therapy would "require the child . . . to have some buy-in."[23]

Karen Lavoie, the chemical dependency contractor who performed L.S.'s assessment at DOC, testified that the level 3.5 treatment she recommended for L.S. included sober support groups. While she did not recall telling L.S. that such support groups were part of the treatment, her written assessment form included that recommendation and she checked a box on the form indicating L.S. "had been informed of the assessment and the results."[24] Lavoie testified that she would have gone over the

---

[22] Ex 24.
[23] 1 RP at 51.
[24] 2 RP at 122.

form with L.S. before checking that box. When asked if L.S. was willing to attend sober support groups, Laovie said, "only if it was a requirement."[25]

L.S.'s DOC classification counselor, Susan Erickson, testified that in September 2106, Cedar Creek requested his transfer to a DOC facility offering level 3.3 treatment. Because the termination trial was imminent, Erickson decided a transfer should await the end of trial so that a counselor familiar with L.S. would still be on board during the trial.[26]

L.S. testified and admitted having four prior convictions for possession of controlled substances. He stated that he had voluntarily entered treatment three times over the years but had never completed treatment. He conceded he had not participated in Alcoholics Anonymous or other support groups at Cedar Creek. He denied knowing that his court-ordered services included random UAs.

L.S. stated he was pursuing his general education diploma and planned to get a stable job and stable living situation upon his release. He thought it would take "[a]t least a year" to accomplish those goals after his release.[27] When asked if he was essentially "asking for temporary placement for . . . the next three years while you have two years to complete your sentence . . . and then another year before you can get your living situation together," L.S. said, "Yes."[28] When asked if he completed any services during the earlier dependency, L.S. conceded he had not and claimed the court did not ask him to complete any services.

---

[25] 2 RP at 122.
[26] 1 RP at 57.
[27] 2 RP at 148.
[28] 2 RP at 236.

L.S.'s cousin and sister testified to his positive attributes, appropriate caregiving, and parenting skills.

On November 3, 2016, the court entered the following pertinent findings of fact and conclusions of law:

> 2.3.2 [L.S.] entered an agreed order on June 4, 2008. . . . The father partially complied with services at the outset of that dependency by participating in a drug and alcohol evaluation. However, by November of 2009 the father was no longer compliant with his services and had indicated that he could not care for the child. Ultimately the mother was able to make sufficient progress in her services to allow return of [D.F.-S.] to her care and dismissal of the dependency on 12/27/2010. . . .
>
> . . . .
>
> 2.4 Although [L.S.] was personally served with the second dependency petition and notice of the court dates, he did not participate at all in early stages of the dependency. . . . The father was ordered to participate in Random Urinalysis (UAs), a Drug/Alcohol evaluation, and a psychological evaluation with a parenting component and to follow the recommendations of these evaluations.
>
> . . . .
>
> 2.6 Ordered services and all services, reasonably available, and capable of correcting parental deficiencies have been understandably offered or provided.
>
> > 2.6.1 The father simply did not make himself available to participate in services during the first nearly two years of the dependency. He completely disappeared for nearly all of the first years. . . .
> >
> > . . . .
> >
> > 2.6.3 Ms. Livingston was unable to make contact with the father until he appeared without notice at her office sometime in April 2014. At that meeting, she attempted to explain court ordered services to the father and provide him with the court's order. The father became very angry and threw the order in her face. . . . The father stormed out of the meeting and returned only when the mother requested he come back to sign the rules of visitation. In a subsequent meeting, he told Ms. Livingston that he would only participate in a drug and alcohol assessment and planned to initiate that service at Seattle Indian Health Board, which did not require a referral from the Department.

2.6.4. Ms. Livingston was unable to provide the father a referral for a specific UA facility because the father would not tell her where he was living or work with her to establish a UA location that was in the area he was staying. However, father did come to her office on at least four occasions . . . . In each instance, he did not coordinate with her prior to arriving. . . .

2.6.5 Despite assurances from Ms. Livingston that she would not contact law enforcement concerning the father's outstanding warrants, the father did not make himself available to participate in services until after his arrest in September 2015.

2.6.6 . . . At all . . . hearings [between 11/13 and 3/15] the father was found not in compliance with any of his services, not making progress and not visiting consistently with the child.

2.6.7 Social Worker Pam Rago . . . arranged for [D.F.-S.] to visit his father twice at the King County Jail prior to the father's transfer to DOC custody.

2.6.8 Ms. Rago worked with the father's counselor at the DOC and arranged for him to participate in both a substance abuse assessment and a psychological evaluation with a parenting component at Cedar Creek Correctional Facility.

. . . .

2.7 There is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future.

2.7.1 This child has been out of his father's care for a substantial part of his life. He has been found dependent twice, was in a voluntary placement prior to that and has been in the informal care of his family and friends at various points in his life when his parents were unwilling or unable to care for him. The near future is determined from the point of view of the child and the nearly three years it would take for the father to be able to provide the safety and stability this child needs is well beyond his near future.

2.7.2 The father has been incarcerated since September 2014, first at King County Jail, followed by his transfer to the [DOC]. The father's corrections officer, Susan Erickson, confirmed that the father's release date is December 18, 2018 and that he would be eligible for

work release on June 17, 2018, presuming his behavior remains good.

2.7.3 Following his release from incarceration, the father will need a significant period of time to address his deficiencies in order to be available to provide a stable and safe placement for his son. The father estimated that he would need a year following his release before he would be ready to parent [D.F.-S.] However, Dr. Tutty recommended that reunification not be considered until the father had demonstrated sobriety and stability for 18 months following his release. Dr. Tutty noted that the other services he recommended for the father, should reunification be attempted, would need to be engaged in following his demonstration of stable sobriety.

. . . .

2.7.5 Dr. Tutty was very concerned about any plan to reunite [D.F.-S.] with his father. He indicated that where there is a pattern of this length of substance abuse coupled with his history of neglect there is a high likelihood of future neglect. This is not prognostic of a safe return of the child in the near future. Dr. Tutty felt that the risk factors were just too high. He did comment that one of the factors he considered was [L.S.'s] numerous failed attempts to complete a drug and alcohol treatment program and maintain sobriety.

2.7.6 The father's lack of insight was apparent throughout his testimony. He felt that there was no impact to [D.F.-S.] from his drug use, even though he was absent from [D.F.-S.'s] life for probably the majority of [D.F.-S.'s] life and certainly the most recent years of his life because of criminal problems related to his drug use. He also failed to recognize that because of his use of drugs and incarceration, [D.F.-S.] was frequently left in dangerous situations without appropriate supervision.

2.7.7 His lack of insight was also demonstrated by his testimony regarding his own need for [D.F.-S.] to be in his life, indicating that [D.F.-S.] had no choice but to wait for another three years because he was his son. He demonstrated no recognition that his son's needs might be different than his own or that his son's needs needed to be prioritized.

2.7.8 While the father expressed that he would do whatever was needed to have his child returned to his care, his decision not to seek help through the sober support meetings and mental health counseling that were available at his correctional facility are not the

decisions of someone dedicated to repairing the situation that brought this child into care.

2.8 Continuation of the parent[-]child relationship clearly diminishes this child's prospects for early integration into a permanent and stable home.

> 2.8.1 The court has considered the factors set forth in [RCW] 13.34.145(5)(b) and does not believe that the father has a meaningful relationship with his son. . . .

> 2.8.2 Even if there had been a meaningful relationship between the father and [D.F.-S.], there is not an alternative petition before the court that would allow for the permanence. No appropriate guardian has come forward and expressed interest in providing permanence for this child.

> 2.8.3 At this point, it is clear that [D.F.-S.] does not wish to have [a] relationship with his father. He has declined visits and phone calls. [D.F.-S.] has indicated that he wishes to be adopted. Although the wishes of a child [D.F.-S.'s] age are certainly not conclusive, they are a factor that must be considered.
>
> . . . .

> 2.8.4 [D.F.-S.] has prospects for adoption and would not be able to integrate into a permanent and stable home until his legal relationship with his father is terminated.

2.9 Termination of the parent-child relationship between [L.S.] and [D.F.-S.] is in the child's best interest.

> 2.9.1 There is no doubt that the father is sincere in wanting to parent [D.F.-S.] and to rehabilitate his life. However, given the history of the father's many relapses and absences from this child's life, considered along with the long period of instability that this child has lived through, [D.F.-S.] should not have to wait any longer for permanence.

> 2.9.2 Despite the Department's efforts to provide contact between the father and [D.F.-S.], when [D.F.-S.] was provided the discretion to reject further contact, he chose to do so. He visited with his father twice at King County Jail and participated in one phone call with his father at Cedar Creek Corrections Center and thereafter refused to speak with his father.
>
> . . . .

2.10 Based upon the evidence presented and findings above, the court finds current unfitness. There is no dispute that the father will be unavailable to provide a safe and stable home for his son prior to his release in December 2018. The father's lack of insight and undressed substance abuse issues would present a risk to his son if he were to return to his father's care.

The status of the child's sibling relationships and the nature and extent of sibling placement, contact or visits is as follows: [D.F.-S.] has an adult sibling with whom he does have periodic contact.[29]

The court concluded that the Department proved the criteria for termination by clear, cogent, and convincing evidence and that termination was in D.F.-S.'s best interests. L.S. appeals.

## ANALYSIS

### Standard of Review

Parental rights are a fundamental liberty interest protected by the United States Constitution. Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). To terminate parental rights, the State must satisfy a two-step test. First, it must prove the following statutory elements by clear, cogent, and convincing evidence:

> (a) That the child has been found to be a dependent child;
> (b) That the court has entered a dispositional order pursuant to RCW 13.34.130;
> (c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
> (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;

---

[29] Clerk's Papers (CP) at 272-77. L.S. assigns error to findings of fact 2.6 to 2.6.11, 2.7 to 2.7.8, 2.8 to 2.8.4, 2.9 to 2.9.4, and 2.10.

(e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future . . .[; and]

(f) That the continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

RCW 13.34.180(1). If the trial court finds that the State has met its burden under RCW 13.34.180, it may terminate parental rights if it also finds by a preponderance of the evidence that termination is in the "best interests" of the child. RCW 13.34.190(2)(b).

On review, unchallenged findings of fact are considered verities. In re Interest of J.F., 109 Wn. App. 718, 722, 37 P.3d 1227 (2001). Challenged findings will be upheld "[i]f there is substantial evidence which the lower court could reasonably have found to be clear, cogent and convincing . . . ." In re Aschauer, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980). Because the trial court hears the testimony and observes the witnesses, its decision is entitled to deference. In re Dependency of A.V.D., 62 Wn. App. 562, 568, 815 P.2d 277 (1991). Consequently, we defer to the trier of fact on issues of conflicting testimony, credibility of the witnesses, and the weight or persuasiveness of the evidence. A.V.D., 62 Wn. App. at 568; In re Welfare of S.J., 162 Wn. App. 873, 881, 256 P.3d 470 (2011); State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

L.S. contends the Department failed to prove by clear, cogent, and convincing evidence that it expressly and understandably offered or provided all court-ordered and necessary services as required by RCW 13.34.180(1)(d). Specifically, he contends the Department failed to "(a) timely offer a court-ordered psychological evaluation, (b) failed to provide integrated psychological and chemical dependency treatment, (c) failed to

17

timely investigate, obtain, and offer services due to incarceration, and (d) failed to provide attachment services."[30] We address each of these arguments in turn.

Timeliness of Psychological Evaluation and Recommended CBT

L.S. contends the Department failed to timely offer either the court-ordered psychological evaluation or the CBT recommended in that evaluation. Noting that the evaluation occurred nearly three years after the court ordered it and that he did not receive CBT during the brief two-month period between the evaluation and the termination trial, L.S. contends the delay in offering those services undercuts the court's conclusion that the Department provided all necessary services as required by RCW 13.34.180(1)(d). See S.J.,162 Wn. App. at 881-84 (reversing termination due to Department's failure to timely provide court-ordered mental health service that might have helped the parent progress in other services at an earlier stage and would not have been futile); In re Dependency of T.L.G.,126 Wn. App. 181, 198-203, 108 P.3d 156 (2005) (where "protracted delay" in obtaining psychological evaluations was not "solely (or even mostly)" caused by the parents, there was no reason why mental health services could not be provided pending the evaluations, and there was no finding parents could not have benefitted from the services, the delay and "false premise that all other services should await the [evaluation] results" fatally undermined the court's finding that necessary services were offered).

The record demonstrates, however, that the vast majority of the delay was caused by L.S., not the Department. In an unchallenged finding, the court found L.S. "did not

---

[30] Br. in Supp. of Mot. for Accelerated Review at 2.

participate at all in early stages of the dependency."[31] In several challenged findings, the court found he left invalid contact information with the Department, "did not make himself available to participate in services until after his arrest in September 2015," rejected caseworker Livingston's initial attempt to explain his court ordered services, and later told Livingston he would only participate in a drug and alcohol assessment and planned to initiate that service himself at Seattle Indian Health Board.[32] These findings are supported by substantial evidence.[33]

The record also demonstrates that there was no unreasonable delay once L.S. became available for services. Caseworker Rago testified that when she took over the case in September 2015, L.S. was in the King County Jail and that, to her knowledge, the court-ordered services were not available in the jail. When L.S. moved temporarily to the Washington Corrections Center in Shelton in October 2015, Rago sent him a service letter informing him of the services being offered. She included a copy of the dependency order and the most recent dependency review hearing order. She sent L.S. similar letters throughout the next year.

Despite L.S.'s inaction in response to Rago's service letters, Rago contacted a DOC employee at Cedar Creek shortly after his arrival there. They discussed "what services were available for [L.S.]" and "went over the dependency order."[34] They specifically discussed setting up a psychological evaluation. Rago subsequently received

---

[31] CP at 273 (FF 2.4).
[32] CP at 273 (FF 2.6.1, 2.6.3, 2.6.5).
[33] Under the clear, cogent, and convincing evidence standard, the Department carries its burden if the evidence proves that the necessary facts are highly probable. In re Welfare of M.R.H., 145 Wn. App. 10, 24, 188 P.3d 510 (2008).
[34] 3 RP at 270.

an e-mail from DOC informing her that it would not do the psychological evaluation, but the Department could bring in its own provider to do the evaluation. Rago then contacted L.S.'s attorney who agreed to use Dr. Tutty for the psychological evaluation. In May 2016, Rago made a referral for the psychological evaluation to Dr. Tutty. Dr. Tutty completed the evaluation in August 2016.

In short, the psychological evaluation was timely and repeatedly offered to L.S. and there was no unreasonable delay in its provision. Nor was there an unreasonable delay in offering L.S. CBT. As previously noted, Dr. Tutty recommended CBT in August 2016, only two months before the termination trial. And nothing in the record indicates that CBT was available at Cedar Creek.

In any event, any offer of CBT would have been futile. Termination is appropriate "even where the State inexcusably fails to offer a service to a willing parent . . . if the service would not have remedied the parent's deficiencies in the foreseeable future, which depends on the age of the child." In re Dependency of T.R., 108 Wn. App. 149, 164, 29 P.3d 1275 (2001). This means that when the record establishes that an offer of services would have been futile, the trial court can make a finding that the Department has offered all reasonable services. In re Ferguson, 32 Wn. App. 865, 869-70, 650 P.2d 1118 (1982), rev'd on other grounds, 98 Wn.2d 589, 656 P.2d 503 (1983); In re Parental Rights to K.M.M., 186 Wn.2d 466, 483, 379 P.3d 75 (2016). Considering L.S.'s minimal participation in services throughout his dependency and his failure to use available mental health counseling or sober support services during his entire stay at Cedar Creek, any offer of CBT during the few months before the termination trial would have been futile.

20

Psychological and Chemical Dependency Treatment

L.S. next contends the Department failed to provide integrated mental health and chemical dependency treatment as required by In re Welfare of S.J., 162 Wn. App. 873, 881-84, 256 P.3d 470 (2011). He contends S.J. is controlling and requires reversal. We disagree.

In S.J., the dispositional order stated that mental health services would be provided *only* after the mother achieved sobriety. After three failed attempts to complete inpatient drug treatment, the mother succeeded soon after receiving mental health services. On appeal, the mother argued that "coexistent mental health services were necessary for successful early treatment." S.J., 162 Wn. App. at 882. The S.J. court determined the mother's initial inability to complete inpatient treatment was linked to her mental health issues. 162 Wn. App. at 882. The court noted a legislative finding that often "'integrated treatment of co-occurring disorders is critical to successful outcomes and recovery.'" S.J., 162 Wn. App. at 882 (quoting Laws of 2005, ch. 504, § 101). The court concluded the Department failed to timely offer or provide all necessary services because it did not offer concurrent mental health and substance abuse treatment for her co-occurring disorders.

This case bears no resemblance to S.J. Neither the dispositional order nor the Department required sequential substance abuse and mental health treatment in this case. Rather, the dispositional order offered chemical dependency and psychological evaluations simultaneously and directed L.S. to initiate both within 30 days. In addition, the parent in S.J. fully engaged in services but was hampered in her substance abuse treatment by the Department's refusal, despite knowledge of identified mental health

issues, to offer concurrent mental health treatment. By contrast, L.S. did not participate in any evaluations or services until late in the dependency and eschewed available counseling and sober support groups while incarcerated. S.J. is inapposite.[35]

### Timely Services During Incarceration

Citing RCW 13.34.136(2)(b)(i)(A),[36] L.S. contends the Department "failed to timely request a transfer . . . to a prison facility that provided [necessary] services . . . ."[37] Specifically, he contends that because his chemical dependency assessment recommended level 3.5 treatment "immediately,"[38] and because level 3.3 treatment was available at another facility, the Department had a duty to immediately transfer him to that facility. We reject this contention for several reasons.

First, the Department contends, and L.S. does not dispute, that it "has no control over the placement of inmates within the Department of Corrections" and "lacks authority to move any incarcerated person or to recommend such movement."[39] Second, nothing in the record demonstrates that the Department could have facilitated an earlier transfer. In fact, the supervisor of the DOC substance abuse recovery unit testified that DOC attempts to find other facilities that offer inmates' treatment needs, but transfers are available only under specific conditions. For example, the receiving facility must be

---

[35] L.S.'s claim that "[t]he Department failed to offer a psychological evaluation because L.S. had not demonstrated he was sober enough" is not supported by the record. Br. in Supp. of Mot. for Accelerated Review at 21.

[36] RCW 13.34.136(2)(b)(i)(A) provides in part: "If the parent is incarcerated," the permanency plan must "include treatment that reflects the resources available at the facility where the parent is confined."

[37] Br. in Supp. of Mot. for Accelerated Review at 23.

[38] 2 RP at 113.

[39] Br. of Resp't at 22.

appropriate to the inmate's custody level and estimated release date. A transfer is also dependent on bed availability and requires input from the classification and transportation units "because they're responsible for the actual risk ratings and custody level for the offenders."[40] The record thus supports the Department's contention that a transfer to another facility was beyond its control.

Third, the focus of RCW 13.34.136(2)(b)(i)(A) is on providing treatment "available *at the facility where the parent is confined.*"[41] Thus, the Department's duty was to make reasonable efforts to refer an inmate to services available *in his or her facility.* See In re Dependency of D.L.B., 186 Wn.2d 103, 123, 376 P.3d 1099 (2016) (Department's duty is to provide all services that are reasonably available in the facility where the parent is confined). The Department fulfilled that duty.

### Parent-Child Attachment Services

L.S. asserts the Department did nothing to implement a service recommended by Dr. Tutty "to improve the emotional bond between L.S. and [D.F.-S.]."[42] But Dr. Tutty recommended this service only "[i]f the Department elects to proceed with reunification upon *[L.S.'s] DOC release.*"[43] Furthermore, the record and findings in this case demonstrate that an offer of bonding services during the few months between Dr. Tutty's report and termination would have been inappropriate and futile.

---

[40] 2 RP at 127.
[41] (Emphasis added.)
[42] Br. in Supp. of Mot. for Accelerated Review at 26.
[43] Ex. 24 (emphasis added).

Several witnesses, including Dr. Tutty, indicated that bonding therapy would be inappropriate and likely unsuccessful until D.F.-S. desired contact with his father. D.F.-S. expressed no desire to contact L.S. prior to termination. In addition, Dr. Tutty noted that L.S. was "unlikely to benefit from treatment services, as his level of paranoia would likely interfere with genuinely applying treatment skills into his own parenting."[44] These facts demonstrate futility. See K.M.M., 186 Wn.2d at 480-81, 483 (attachment and bonding service would have been futile where child "could not tolerate interactions with her father," "refused to attend visitation," and "would not be a willing participant in any therapeutic services with her father"); K.M.M., 186 Wn.2d at 485 (father's mental health issues rendered him unable to support the child's attachment to him).

L.S.'s remaining arguments fail because they proceed from the premise, rejected above, that the Department failed to provide all necessary services and/or are too conclusory to merit discussion. We note, however, that the record belies his conclusory assertion that termination was not in D.F.-S.'s best interests. Caseworker Rago and the CASA agreed that termination was in D.F.-S.'s best interests. Caseworker Livingston saw no progress with L.S. during her time on the case and said he could not safely parent D.F.-S. until he addressed his substance abuse. Dr. Tutty testified that L.S. would have to demonstrate 18 months of sobriety *after his release in 2018* before reunification could be considered. Considering D.F.-S.'s age, adoptability, and express preference to have no contact with L.S., and given L.S.'s lack of progress and long-term unavailability, the record amply supports the court's finding that termination was in D.F.-S.'s best interests.

---

[44] Ex. 24.

Affirmed.

_Trickey, J_

WE CONCUR:

_____                    _____