IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Dependency of:<br>L.A.L.; D.L.L.; A.D.L. | )<br>)<br>) | No. 79220-2-I<br>(Consolidated with<br>No. 79221-1-I, and |
| STATE OF WASHINGTON,<br>DEPARTMENT OF CHILDREN,<br>YOUTH AND FAMILIES, | )<br>)<br>)<br>) | No. 79222-9-I) |
| | ) | DIVISION ONE |
| Respondent, | )<br>) | UNPUBLISHED OPINION |
| v. | )<br>) | |
| ARRION DEMAR LAMB, SR., | )<br>) | |
| Appellant. | )<br>) | |
| | ) | FILED: September 23, 2019 |

HAZELRIGG-HERNANDEZ, J. — The juvenile court terminated Arrion D. Lamb's parental rights to his three children. Substantial evidence supports the trial court's findings with regard to the statutory factors necessary for termination. And the father received adequate notice of the parental deficiencies that formed the basis for the termination. We affirm.

## FACTS

Arrion Lamb is the biological father of three young children.[1] The Department of Children, Youth, and Families (Department) became involved with the family in August 2016 when the children were one, four, and six years old. At that time, the Department received reports that the family was homeless, that

---

[1] The parental rights of the children's mother are not at issue in this appeal.

both parents were actively using heroin, and that the father recently assaulted the mother and knocked out two of her front teeth. The Department also learned that the mother left the children in the care of a third party so she could obtain drug treatment, but then quickly abandoned treatment.

The Department took the children into custody and initiated a family team decision meeting to discuss placement of the children. The father admitted to recent drug use and to the recent assault. He also acknowledged an earlier domestic violence incident that led to police involvement. The father denied any violent behavior toward the children. Both parents signed a voluntary placement agreement, allowing the children to be placed out of their care for a month so they could complete chemical dependency assessments, and participate in urinalysis testing and substance abuse treatment.

In the month that followed, the Department offered chemical dependency assessments, urinalysis testing, and provided transportation assistance, but the father was largely unreachable and unresponsive. By the end of the month, the father had not participated in any services or visited with the children. The Department agreed to extend the voluntary placement agreement, based on stipulations that the father would promptly complete a chemical dependency assessment and start urinalysis testing. The father failed to complete an assessment and his single urinalysis test was positive for opiates and amphetamines.

Based on the history of substance abuse, domestic violence, homelessness, and several pending criminal charges against the father, the

Department filed a petition for dependency. The Department alleged that the children witnessed the domestic violence. In January 2017, the court entered an order finding the children dependent as to the father under RCW 13.34.030(6)(c) because they "had no parent, guardian, or custodian capable of adequately caring" for them. The court ordered the father to successfully complete 90 days of urinalysis testing; to complete a drug and alcohol evaluation and follow any recommended treatment; to complete a parenting assessment with a domestic violence component and follow any treatment recommendations; and to establish the paternity of one of the children.[2]

The father did not engage in any services or regularly visit the children in 2016 or in 2017 after the entry of the dependency order.

In March 2017, just over two months after the court found the children to be dependent, the father committed robbery in the second degree while armed with a deadly weapon. In October 2017, he pleaded guilty to the crime, and in November 2017, the court sentenced him to 15 months of incarceration. The Department arranged for the children to visit the father at the King County Jail. But after each child visited the father once, the court suspended all visits, primarily based upon the recommendations of two of the children's therapists.

In February 2018, while the father was still incarcerated, the Department filed a petition to terminate his parental rights.

A few months later, on June 5, 2018, the father was released from custody. The Department again provided all court-ordered services to the father

---

[2] The court also ordered the father to engage in an in-home parenting education service once the children were returned to his care.

and encouraged him to participate. Upon his release, the father showed interest in services and began to participate, but for the most part, was unable to successfully complete them. For instance, the father met with the evaluator a few times for the purpose of obtaining a parenting assessment with a domestic violence component. But then he missed subsequent appointments because he was in jail, having violated conditions of his community supervision and failed to complete the assessment.

And just after his release, the father completed a drug and alcohol evaluation at Valley Cities.[3] The evaluation led to a diagnosis of opiate addiction and a recommendation for outpatient drug treatment. In the three to four month period following the evaluation, the father attended approximately five appointments at Valley Cities. Some of those appointments were for mental health treatment, based on diagnoses of paranoid schizophrenia and depression. During a recess in the trial, the father enrolled in a medication-assisted substance abuse program and took his first dose of medication. Although the father participated in some urinalysis testing required by the Department of Corrections (DOC), he did not complete any urinalysis testing ordered by the dependency court, nor did he provide the DOC testing results to the Department.

The Department initiated a process to reestablish contact between the father and the eldest son that began with six scheduled meetings with his son's counselor. The father met once with the counselor but missed all of the

---

[3] The father did not inform the Department about his completion of the assessment until months later, during the termination trial. The social worker assigned to the case expressed concern about the validity of the assessment because it did not reflect the father's current conditions in the community and continued drug use after his release.

4

subsequent appointments. The father refused to agree to allow one of his sons to take medication recommended by the child's physician to treat Attention Deficit Hyperactivity Disorder, and eventually the Department obtained a court order to allow administration of the medication. The father also initially refused to consent to another child's dental surgery unless he could be present, but eventually relented.

Approximately a month after his release from prison, the father relapsed. As a result, he lost his clean and sober housing. The father was sanctioned five times for violating conditions of community supervision. Three of the violations were for using heroin and methamphetamine. Based on the number of violations he had already accrued, the father faced a substantial risk of being returned to prison to serve the remainder of his prison term if he committed further violations of his conditions of supervision.

At the time of the fact-finding hearing in the fall of 2018, the father had been out of custody for almost four months. His sons were ages eight, six, and three and had been out of his care for more than two years. The father had not seen the children in more than a year. Two of the children were in licensed care, in separate households, and the oldest child had been admitted to Ryther, a provider of inpatient and outpatient therapeutic services for youth, for approximately a year. The two older children had been involved in intensive therapy to address behavioral, emotional, and mental health issues. Apart from establishing paternity and obtaining a drug and alcohol evaluation, the father had not completed any of the court-ordered services.

5

The father testified and admitted to recent use of heroin and methamphetamine use and admitted that he had used those drugs in the past when the children were in his care. He did not believe that his drug use prevented him from providing for the safety and welfare of his children. He claimed his drug use was a "mistake," largely because it resulted in the Department's involvement with his family.

The father testified that one of the reasons the children were in the Department's custody was because they witnessed an "altercation" between him and the children's mother, but he disputed the severity of the incident. He acknowledged that he had at least one prior assault conviction involving the mother. Because the father was involved in multiple prior incidents of assault, he could not recall whether or not the children's mother was the victim of his prior aggravated assault conviction in Arizona.

The father testified that his plan to regain custody of his sons was to obtain permanent employment and housing. Although the father met his oldest child's counselor, he said he did not learn anything about why his child was receiving treatment at Ryther.

A Department social worker who supervised the father's case, Xiao Yu Jackson, testified that the father was currently unfit to parent his sons and had made no progress toward correcting his parental deficiencies, which included drug abuse and domestic violence. She testified that it would take at least a year of consistent engagement before the Department could consider placement with the father. Both the Court Appointed Special Advocate and the social worker

assigned to the case at the time of the fact finding hearing likewise testified that that the father was not capable of parenting his sons now or in the near future.

At the conclusion of the fact-finding hearing, after considering the testimony of 6 witnesses and 28 exhibits, the juvenile court entered findings and an order terminating the father's parental rights. Specifically, the court found that the father failed to correct his parental deficiencies related to substance abuse and domestic violence and that termination of parental rights was in the children's best interests.

The father appeals the termination order.

## DISCUSSSION

I.    Standard of Review

Parental rights are a fundamental liberty interest protected by the United States Constitution. Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). To terminate parental rights, the Department must satisfy a two-step test. In re Welfare of A.B., 168 Wn.2d 908, 911, 232 P.3d 1104 (2010). In order to terminate a parent-child relationship, the Department must prove the six elements of RCW 13.34.180(1) by clear, cogent, and convincing evidence. In re Dependency of K.N.J., 171 Wn.2d 568, 576-577, 257 P.3d 522 (2011). Then, if the juvenile court finds that the Department has met its burden under RCW 13.34.180, it may terminate parental rights if it also finds by a preponderance of the evidence that termination is in the "best interests" of the child. RCW 13.34.190(2)(b); A.B., 168 Wn.2d at 911.

Where the trial court has weighed the evidence, our review is limited to determining whether the court's findings of fact are supported by substantial evidence and whether those findings support the court's conclusions of law. In re Dependency of P.D., 58 Wn. App. 18, 25, 792 P.2d 159 (1990). "'Substantial evidence' is evidence in sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise." In re Welfare of T.B., 150 Wn. App. 599, 607, 209 P.3d 497 (2009) (citing World Wide Video, Inc. v. City of Tukwila, 117 Wn.2d 382, 387, 816 P.2d 18 (1991)). The determination of whether the findings of fact are supported by substantial evidence "must be made in light of the degree of proof required." P.D., 58 Wn. App. at 25. In determining whether substantial evidence supports the trial court's findings, this court does not weigh the evidence or the credibility of witnesses. In re Dependency of E.L.F., 117 Wn. App. 241, 245, 70 P.3d 163 (2003).

II.    Offer or Provision of Services

The father challenges the juvenile court's finding that the Department offered or provided all necessary services capable of correcting his parental deficiencies as required by RCW 13.34.180(1)(d). In particular, he claims the Department did not make reasonable efforts to provide services to him when he was incarcerated for robbery.

To meet its burden under RCW 13.34.180(1)(d), the Department must prove that "the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably

8

available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided." Necessary services are "those services 'needed to address a condition that precludes reunification of the parent and child.'" K.M.M., 186 Wn.2d at 480 (quoting In re Dependency of A.M.M., 182 Wn. App. 776, 793, 332 P.3d 500 (2014)). A service is "reasonably available" if it is "available within the department [or supervising agency], or within the community" or "the department has existing contracts to purchase" it. RCW 13.34.136(2)(b)(vii). When a parent is incarcerated, the permanency planning statue, RCW 13.34.136(2)(b)(i)(A), requires the Department to craft a permanency plan that focuses on the provision of services that are "available at the facility where the parent is confined."

With respect to this factor, the court found:

> 2.14 Services ordered under RCW 13.34.130 have been expressly and understandably offered or provided and all necessary services reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided, including Urinalysis (UA) testing, a substance abuse evaluation (and recommended treatment) and a parenting assessment with a domestic violence component.

> 2.15 [The Department] has made service referrals to [the father] on multiple occasions, including sending him multiple service letters detailing where he can participate in the ordered services. In October, 2017 [the father] pled guilty to Robbery in the Second Degree. He was incarcerated until June 2018 and some, if not all, services were not available to him while he was incarcerated.

The father was incarcerated for approximately 13 months of the dependency that lasted almost two years. In 2017, when the father was confined at the King County Jail, Department personnel provided him with multiple service

letters, outlining the services ordered by the dependency court. These letters also informed the father that the primary court-ordered services, a drug and alcohol assessment and treatment, a parenting assessment with a domestic violence component, and random urinalysis testing, were unavailable at the jail. The Department informed the father that certain other drug and alcohol-related programs were available in jail and encouraged him to participate.

Department supervisor Jackson also visited the father personally at the jail once in the fall 2017.[4] Until visitations were suspended, the Department arranged for the children to visit the father.

By October 2017, the Department had identified a provider who was willing to conduct a parenting assessment with a domestic violence component at the jail and referred the father for that service. The Department provided the father with the provider's name and telephone number. Department staff and the provider herself made multiple attempts over many months to arrange for the evaluation at each of the facilities where the father was housed. But these attempts were not successful, largely because the father did not remain at the same facility. The father moved from the King County Jail to a DOC facility, then to Snohomish County Jail, and was finally returned to a DOC facility. In addition to the transfers, the record suggests the Department's efforts to schedule the evaluation were hampered by difficulty obtaining information from the DOC and the Snohomish County Jail.

---

[4] Jackson testified that she directed another social worker who took over the case to visit the father in jail, but she did not know for certain whether or not that visit occurred.

The father cites a lack of evidence that Department staff personally met with him or sent him any letters regarding services after he was moved from the King County jail. He further points out that no Department witnesses testified about the unavailability of services at the Snohomish County Jail or at the DOC facility.

The court addressed a similar claim in In the Matter of the Dependency of D.L.B., and held that the Department made reasonable efforts to provide services to an incarcerated parent where the Department's social worker contacted the jail and learned that only one required service was available at the facility where the parent was in confinement. 186 Wn.2d 103, 122-23, 376 P.3d 1099 (2016). The Department's efforts were at least as substantial in this case. The record as a whole shows that while the father was incarcerated, the Department investigated whether court-ordered services were available, communicated with the father, and made significant efforts to provide a service that was unavailable to him in any of the facilities, a parenting assessment with a domestic violence component. The lack of evidence about the Department's actions with respect to each facility where the father was confined, does not render its overall efforts insufficient. This is especially true where the Department was apparently not notified of each transfer and the facilities were unresponsive to the Department's requests for information. On this record, we conclude the Department fulfilled its duty to make reasonable efforts to refer the father to available services.

The father's argument also ignores the fact that he failed to meaningfully engage in services when they were undisputedly available to him before and

after he was incarcerated. The Department is not required to offer services that would be futile. In re Dependency of T.R., 108 Wn. App. 149, 163, 29 P.3d 1275 (2001). If a parent is unwilling or unable to make use of the services offered or provided, the Department is not required to offer additional services that might have been helpful. In re Dependency of S.M.H., 128 Wn. App. 45, 54, 115 P.3d 990 (2005).

Apart from submitting to one urinalysis test in 2016, which was positive for amphetamine and opiates, the father did not participate in any service before he committed robbery and went to jail in 2017. The Department again offered all court ordered services to the father upon his release in June 2018. In the four months preceding the trial, the father completed only a drug and alcohol evaluation.

The Department made reasonable efforts to provide services throughout the dependency, including the period of time when the father was incarcerated. Even if this were not the case, the Department's failure to offer services during this period would be excusable. Despite referrals for services and encouragement to participate in them, the father was unable or unwilling to complete most of the services or and failed to make significant progress.

III.     Likelihood that Conditions Will Be Remedied in the Near Future

The father also challenges the court's finding that "[t]hat there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." RCW 13.34.180(1)(e). The focus of this statutory

factor is on whether the identified parental deficiencies have been corrected. T.R., 108 Wn. App. at 165. Even where evidence shows that a parent may eventually be capable of correcting deficiencies, termination is appropriate if those deficiencies will not be corrected within the foreseeable future. In re Welfare of A.G., 155 Wn. App. 578, 590, 229 P.3d 935 (2010) (citing In re A.W., 53 Wn. App. 22, 32, 765 P.2d 307 (1988)).

What constitutes "near future" necessarily depends on the specific circumstances of each case, including the child's age and placement circumstances. In re Welfare of C.B., 134 Wn. App. 942, 954, 143 P.3d 846 (2006). A matter of months may be outside the foreseeable future for a young child. In re Welfare of M.R.H., 145 Wn. App. 10, 28, 188 P.3d 510 (2008). "When it is eventually possible but not imminent for a parent to be reunited with a child, the child's present need for stability and permanence is more important and can justify termination." C.B., 134 Wn. App. at 958-59.

Here, the court found as follows:

2.20 There is little likelihood that conditions will be remedied so that the children can be returned to their father within the near future.

. . .

2.25 The credible estimate is that even in a best case scenario it will be at least 12 months of consistent participation in services before [the father] would be in a position to possibly parent his sons. A best case scenario is unlikely given [the father's] history of relapse and inconsistent participation in services.

. . .

2.27 12 months is not the near future to these children and is too long to wait for a mere possibility of progress. The near future is

13

measured in months, not years, for children of these ages. Despite [the father's] love for his children and his desire to have a relationship with them, this is outweighed by the boys' needs for stability and permanence now.

. . .

2.34 The children's father is unfit to parent these children. He has not cured his parental deficiencies related to substance abuse and domestic violence and will not be able to do so in the near future.

The father contends there is insufficient evidence in the record to support these findings, because contrary to the court's findings, he made "huge strides toward completing his court ordered services" in the four months prior to the termination hearing. The father points out that he completed a drug and alcohol evaluation shortly after his release, enrolled in a drug treatment program, and attended appointments with his oldest son's counselor and a parenting evaluator.

But the father's characterization of his progress fails to take into account all of the facts. The father ignores evidence indicating that while he initially appeared to be motivated to address his parental deficiencies upon his release, he quickly reverted to drug use and sporadic engagement. At the time of trial, the father was homeless, was still struggling with drug addiction, and had used drugs during the pendency of the trial. The father had done nothing to address his domestic violence issues and had not completed a parenting assessment with a domestic violence component to learn what treatment might be recommended. The father made no progress toward reestablishing visitation, since he attended only one of six scheduled appointments with his son's counselor and testified that he learned little about the reasons for his son's treatment. While the father appeared to have good intentions upon his release,

there was a lack of evidence of sustained actual efforts to match those intentions. And there was countervailing evidence that the father believed that neither domestic violence nor drug use affected his parenting.

Moreover, Jackson testified that it would be at least a year before the Department could consider reunifying the children with their father, assuming consistent participation and progress in all services in the interim. She also testified that a year was beyond the near future for the children, based on their ages of eight, six and three. Even if we were to agree that the evidence showed a trajectory of consistent participation and steady improvement, the evidence supports the court's finding that potential reunification in a year, at the earliest, was not within the children's near future. Substantial evidence supports the juvenile court's finding that there is little likelihood that conditions would be remedied so that the children could be returned to the father's care in the near future.[5]

## IV.  Due Process

The father alleges a due process violation. He contends the juvenile court terminated his parental rights, in part, based on his failure to address domestic violence, a deficiency of which he was not notified prior to the termination trial.

Parents have a fundamental liberty interest in the care and welfare of their children. In re Dependency of Schermer, 161 Wn.2d 927, 941, 169 P.3d 452

---

[5] The father assigns error to numerous other findings made by the juvenile court. We address the findings only to the extent that the father provides specific argument in his briefing. See Brown v. Vail, 169 Wn.2d 318, 336 n.11, 237 P.3d 263 (2010) (citing Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992)); RAP 10.3(a)(6).

(2007). Parental rights cannot be abridged without due process of law. A.M.M., 182 Wn. App. at 790-91. Due process requires "'that parents receive notice of the specific issues to be considered'" at a termination hearing. Id. at 791 (quoting In re Welfare of Martin, 3 Wn. App. 405, 410, 476 P.2d 134 (1970)). Such notice is required "'to prevent surprise, helplessness and disadvantage.'" Id.

The order of dependency and petition to terminate the father's parental rights described two main issues underlying the dependency: substance abuse and domestic violence. The primary services ordered by the dependency court were designed to address these issues. Yet, the father contends he was unaware that the court could rely on his untreated domestic violence issues as a basis to terminate his parental rights. The father points out that neither the order of dependency nor the Department's termination petition specifically labelled domestic violence as a parental deficiency and the court expressly declined to order a separate domestic violence assessment or domestic violence treatment.

But no authority suggests that constitutionally adequate notice is dependent on the use of specific language. In In the Matter of the Parental Rights of F.M.O., the court rejected a similar argument that evidence of notice of parental deficiencies could be found only in certain pleadings. 194 Wn. App. 226, 230, 374 P.3d 273 (2016). The court in F.M.O., held that review of the entire record must show that both sides were aware of what "deficiencies are at issue since the State has to prove the deficiencies to make its case while the parent has to know what allegations to defend against." Id. at 232. The court observed that termination trials are often the "endgame in lengthy proceedings where the

16

parties have wrestled over the needed services during the previous years and there is no question what deficiencies are truly at issue." Id. Because issues may come to light throughout the proceedings, from various sources, the court concluded that it would serve "only form instead of substance" to impose rigid requirements as to how a parent must receive notice. Id.

This rationale also applies here. While neither the order of dependency nor the petition to terminate the father's parental rights uses the phrase "parental deficiencies," it is clear from both documents, and from the record as a whole, that domestic violence was a primary concern of the Department and an issue the father needed to address.

The petition to terminate the father's parental rights highlighted the "history of domestic violence" and past incidents witnessed by the children. The Department also asserted in the petition that there was little likelihood the father's parental deficiencies could be remedied to allow the children to be returned to his care in the near future, in part, because the father was incarcerated and would be unable to complete domestic violence treatment in the foreseeable future.

Both the order of dependency and termination petition also referred to two specific incidents of domestic violence against the mother. The dependency order included the mother's report that the father had been convicted of assaulting her and indicated that one of the children reported to law enforcement that the father had punched him and his brothers. The father's own handwritten correspondence to the court reflects his awareness that domestic violence was one of the reasons the Department took custody of the children.

17

The father's reliance on the dependency court's failure to separately order a domestic violence assessment and treatment is likewise unpersuasive. The dependency court struck the requirement of a separate domestic violence assessment, but included a handwritten interlineation adding a domestic violence component to the parenting assessment. The court also required the father to follow all treatment recommendations following from that assessment. It was clearly a benefit to the father to streamline his court-ordered services to make them less cumbersome. And this consolidation made him no less aware of the possibility that he would be required to participate in domestic violence treatment.

The father relies on this court's decision in A.M.M. 182 Wn. App. at 790-91. But the facts in A.M.M. differ from those here in critical respects. In A.M.M., the dependency proceedings and the termination hearing focused on the mother's substance abuse problems. Id. at 780-83. The mother only became aware of a parental deficiency that could support termination when a social worker testified at the termination trial that the mother lacked an understanding of her children's needs. Id. at 784. But here, domestic violence was an issue throughout the dependency proceedings and the termination trial. The Department's position that domestic violence was a parental deficiency and a barrier to reunification was clear. There was no unfair surprise and the father fails to establish a due process violation.

18

Affirmed.

WE CONCUR: