IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of R.D.A. and I.O.A.,<br><br>　　　　　Minor Children. | No. 83290-5-I<br>(Consolidated with<br>No. 83291-3-I)<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

COBURN, J. — B.A., mother of R.D.A. and I.O.A., appeals an order terminating her parental rights. B.A. brings this appeal claiming she was unable to comply with the trial court's order to participate in substance abuse and mental health treatment due to the domestic violence in her relationship. B.A. asserts that the Department did not offer necessary domestic violence services that would have allowed her to comply. Because she has not established that the Department failed to offer a necessary service, we affirm.

FACTS

On September 24, 2019, B.A.'s two minor children, R.D.A. and I.O.A., were removed from her care following the execution of a search warrant in the family's home. The search uncovered significant quantities of heroin and

Citations and pincites are based on the Westlaw online version of the cited material

multiple loaded firearms stored within reach of the children.  B.A. and her live-in boyfriend, Frederick Pigott, were subsequently arrested.  Pigott had extensive criminal history involving domestic violence (DV).

Police contacted the Department of Children, Youth, and Families' (Department) Child Protective Services (CPS).  CPS investigator Estefanie Laygo's review of B.A.'s Department history showed that both children had previously been removed from her care because of substance abuse issues.  That dependency was dismissed in October 2016 after B.A. subsequently completed substance abuse treatment and parenting classes.  A detective investigating B.A. and Pigott in 2019 relayed to CPS that, in addition to the firearms and narcotics in the home, there were other adults in the home both using and selling drugs.  Following this preliminary investigation, the children were placed into protective custody.

During a family team decision making meeting, B.A. admitted to the investigator that she had issues with substances and that there had been drugs and firearms seized from the home.  B.A. agreed to take a urinalysis (UA) test after the meeting but never went to the testing facility.

Laygo attempted to inquire as to possible DV issues, but B.A. was "very evasive" and "seemed like she's scared to disclose anything" related to Pigott.  B.A. reported to Laygo that she was no longer living with Pigott and was now living in Covington, though she did not provide a specific address.  Laygo offered B.A. two DV resources.  Laygo provided contact information for the Domestic Abuse Women's Network (DAWN) and LifeWire.  DAWN provides advocacy

services, support groups, and assists in finding emergency shelter and housing for victims of DV. LifeWire provides funding for victims of DV to leave their homes and stay in a confidential address or hotel for their safety. DAWN is the primary resource provided to victims of DV by the Department. The program is entirely voluntary and requires victims themselves to reach out to obtain support and services. DAWN does not require any specific referral or any action on the part of the Department for a victim to connect to its services. Generally, courts will not require or order victims of DV to participate in DAWN programming and DAWN will not accept clients who are not participating of their own volition.

Laygo provided contact information for the services to B.A. both in hardcopy format, "in a sticky note or on a piece of . . . paper" and electronically through a text message. B.A. gave no response to the information and was "just quiet." Laygo perceived B.A. as being "scared" and that she did not want to talk about Pigott's situation.

B.A. was unable to help the Department come up with a "specific or a solid plan" to keep her children safe in her care. Laygo determined that the children were not safe due to B.A.'s substance abuse and her failure to protect the children from the drug use and firearms in the home. In the shelter care order that Laygo helped draft, the Department recommended the following services for the mother:

> Chemical and Alcohol Dependency Assessments and follow recommendations; Psychological Assessment with a parenting component and follow recommendations; individual counseling; mental health assessment and follow recommendations; Foster Care Assessment Program; Domestic Violence Assessment and

3

follow recommendations; Evidence Based Parenting Program;
Random UA's[.]

Laygo also drafted the dependency petition. The case transferred to Department social worker Jessica Liebert before the dependency order was entered. While Laygo made recommendations, it was up to Liebert to make the actual referrals.

The court entered an agreed order of dependency on October 29, 2019.[1] The mother agreed that (1) B.A. had an extensive CPS history with concerns of substance abuse, neglect, an unsafe and unsanitary living environment, DV, and lack of supervision; (2) the children were dependent from 2015 through 2016 primarily because of B.A.'s substance abuse; (3) B.A. allowed her boyfriend, who had a history of DV and assaults, to live with her and care for her children; and (4) B.A. had a pending charge for a controlled substances violation in addition to the charges related to her September 2019 arrest.

The court ordered the mother to obtain a drug and alcohol evaluation, a mental health assessment, and a parenting assessment, and also follow treatment recommendations from each. The court ordered B.A. to sign release forms allowing the Department access to information about her compliance and progress with each evaluation and treatment. The court ordered B.A. to abstain from illegal substances and submit to random UAs.

Liebert discussed the services and referrals with B.A. on a monthly basis. She also sent letters to B.A. reminding her of the required services on a monthly basis and would text message B.A. information about resources and referrals

---

[1] Parental rights of the unknown fathers of both children were terminated by court order on February 25, 2021.

and how to access them. Liebert made attempts to meet with B.A. once per month to discuss her progress and any barriers to access that B.A. had encountered.

## Drug Evaluation and Treatment

B.A. obtained a substance abuse evaluation from Valley Cities' Substance Use Disorder Clinic on December 11, 2019. Because B.A. did not sign a release of information, despite several requests from the Department, the Department was unable to obtain information about the provider's drug treatment recommendations during the dependency. The Department was only able to review this information after it was obtained under subpoena in preparation for trial.

The assessment shows that B.A. admitted to using approximately one half-gram of heroin on a daily basis, suffering withdrawal symptoms after nine hours without the drug. B.A. also admitted to using one-quarter to one-half gram of methamphetamine several times per week in an effort to counteract the sedative effects of heroin. The assessment provider recommended B.A. complete intensive inpatient drug treatment.[2] The provider also noted that B.A. would require detoxification prior to the treatment given her "moderate risk of severe withdrawal." It is undisputed that B.A. never completed the recommended treatment.

---

[2] The social worker testified that the provider recommended "intensive outpatient treatment." However, the record of the assessment shows that the provider recommended intensive inpatient treatment.

Mental Health Assessment and Treatment

B.A. arranged for and completed a mental health assessment with Valley Cities behavioral health clinic.  Liebert provided information to the service provider for use in the assessment.  Following the assessment, the provider recommended B.A. continue with counseling and engage in cognitive behavioral therapy.  While B.A. did participate in "maybe six" of the recommended twice-monthly counseling sessions following this recommendation, her overall attendance was "inconsistent and spotty."  B.A. missed at least nine scheduled appointments for mental health care between December 2019 and March 2021. It is undisputed that B.A. did not engage in the recommended cognitive behavioral therapy and counseling.

Drug Screening

B.A. also failed to comply with the required random UA testing to confirm her claims of sobriety.  The court ordered B.A. to submit to UAs once per week for 90 days.  Under the dependency order, an "unexcused missed appointment" is considered a test positive for drugs.  To accommodate B.A.'s requests, the Department made referrals to three different facilities where B.A. could submit to UAs.  B.A. did not participate in any UAs at any of the facilities.

During the dependency, Liebert asked if there were any barriers to accessing the facilities or any issues with transportation to the facilities.  B.A. never identified any reason keeping her from participating in the testing and declined any transportation assistance from the Department.  It is undisputed that

B.A. never participated in any UAs in approximately 21 months between the order of dependency and the termination trial.

Parenting Evaluation and Treatment

Dr. Carmela Washington-Harvey, a licensed mental health provider, conducted the parenting assessment of B.A. This assessment consisted of several meetings between B.A. and Washington-Harvey, as well as a review of the Department records and an observation of B.A.'s parenting via Zoom. Washington-Harvey made several treatment recommendations in December 2020.

The first recommendation was to comply with the mental health treatment plan, specifically with cognitive behavioral therapy. B.A. had not been in contact with her mental health care providers at Valley Cities for more than six months at the time this recommendation was made. B.A. was subsequently discharged from Valley Cities' behavioral health clinic for failing to engage in mental health services. The next recommendation was to participate in and complete a parent education program. The social worker provided a referral to the Positive Parenting Program. B.A. began the program in March 2021 and completed it in May 2021. The third recommendation was for B.A. to confirm her claims of sobriety with random UAs. It is undisputed that the only recommendation B.A. completed was the parenting education program.

Visitations

The dependency order permitted B.A. visitation with each of her children for two hours twice per week. B.A.'s older child was placed into a foster home in

7

Eastern Washington.  The Department shifted the visitation schedule to accommodate B.A.'s need to travel to see her older child.  The schedule was modified to a once per month weekend visit, with six hours of visitation on both Saturday and Sunday.  The Department was even able to extend those visits to eight hours each.  The Department offered plane tickets, bus tickets, gas cards, and hotel rooms to facilitate B.A.'s visitation.  B.A. declined all but the hotel rooms, assuring the Department she would drive herself.  Although the COVID-19 pandemic impacted in-person visitation, the Department was able to arrange in-person visitation between B.A. and R.D.A. beginning in June 2020.  B.A. missed 21 scheduled visits with R.D.A.

B.A.'s youngest child, I.O.A., was placed into a foster care home in Western Washington.  B.A.'s visitation with I.O.A. was "already inconsistent" when the COVID-19 pandemic required visitations to be virtual.  The Department scheduled 20 virtual visitation sessions.  B.A. attended approximately one quarter of those visits.  B.A. was able to resume in person visitation with I.O.A. in September 2020.  B.A.'s attendance at these visits was so inconsistent that the Department set up a confirmation process with her.  B.A. missed 18 scheduled visits with I.O.A.

Domestic Violence Services

One of the parenting deficiencies noted on the dependency order is "the mother has allowed her boyfriend, who has a history of [DV] and assaults, to live with her and the boys and care for the children."  This notation was based on

Pigott's criminal history which included a charge of DV assault. [3] The

Department did not view being a victim of DV itself as a parenting deficiency.

Rather, the Department's concern was that the abusive relationship with Pigott

prevented B.A. from being a protective factor for her children. A parent's choices

surrounding DV, such as subjecting children to living with a partner's violence or

neglecting children due to the effects and impacts of abuse, are what make this a

parental deficiency, according to the Department.

During the dependency, B.A. acknowledged to Washington-Harvey that

her post traumatic stress disorder was linked to her DV history. Having reported

as a DV victim, Washington-Harvey recommended, as part of her parenting

evaluation, that B.A. continue or be in compliance with her mental health

treatment. The recommended cognitive behavioral therapy would help B.A. with

decision-making and could help treat past trauma. According to Washington-

Harvey, there is no specific therapy or treatment available for DV victims other

than cognitive behavioral therapy and support from organizations such as

DAWN.

Washington-Harvey also testified that she is pretty sure she would have

offered a service such as DAWN to B.A., because that is her common practice if

a client identifies as a victim of DV.

Concerned about the fact that B.A.'s partner was someone who had a

history of DV assault, Liebert "continuously followed up with [B.A.] on if she was

---

[3] The information available to Liebert at that time did not specify that B.A. was the victim of Pigott's prior domestic violence assault and Liebert was unaware of any court proceedings in which B.A. was named as a victim of domestic violence.

still with Mr. Pigott and if she was able to be a protective factor for her children [be]cause it was clear that Mr. Pigott was not an appropriate person for her to have her children around. And she would inform me that she was not with him and that he was no longer an issue because he wasn't in her life anymore." Not wanting to rely only on B.A.'s self-reporting, Liebert also checked databases to see if B.A. and Pigott shared the same address. Liebert did not find anything to contradict B.A.'s claims that she was no longer with Pigott. According to Liebert, "when [B.A.] would report that he wasn't living with her or that he wasn't in her life, she was very—like, it did seem very genuine. Like, she didn't have like any fear or anxiety when she was reporting it. It was just—it just came out naturally. So, there was no indication that I needed to question her further on the topic." Liebert also knew that Laygo had already attempted to connect B.A. with DAWN. Liebert also discussed DAWN with B.A., but did not provide any specific contact information because B.A. said it was not necessary.

Termination

Throughout the dependency proceedings, the court found B.A. either out of compliance or only in partial compliance with the court's previous orders. On December 4, 2020, the Department filed a petition for termination of B.A.'s parental rights as to both children. The parental deficiencies listed in the petition included B.A.'s inadequate parenting skills, exposure of children to DV, including association with violent individuals putting the children at risk of harm, criminal history, untreated substance abuse, and untreated mental illness. The petition alleged that B.A. had "failed to substantially improve her parental deficiencies in

the fourteen (14) months following" the dependency order, she was "not visiting the children consistently," and "has not made any changes to her behaviors and has not exhibited any behaviors to demonstrate the ability to care for the children."

Despite promises to do otherwise, B.A.'s non-compliance continued after the petition for termination was filed. She promised to obtain a new drug and alcohol evaluation but failed to do so. In March 2021, Valley Cities discharged B.A. from their mental health clinic because she had been "minimally engaged in mental health services at Valley Cities." Valley Cities' last contact with B.A. was June 19, 2020.

### Trial

Trial was held over six days in June and July 2021. At the time of trial, B.A. faced several felony charges related to the possession and distribution of illegal drugs. At trial, B.A. claimed for the first time that she had in fact remained in a relationship with Pigott and lived with him until his arrest for an unrelated assault in February 2021. B.A. testified that being in an abusive relationship with Pigott is the reason she had not complied with the dependency order. When asked how the DV affected B.A. from accessing services, B.A. explained,

> The fact that, like, with, uh—like the drug and alcohol assessment, I—I had been there an hour. He felt like I was there too long, and so I, uhm—so, I just asked to reschedule. Uhm, I wasn't able to make it in, but situations like that, if—if he feels like I'm gone too long, then—then that's a problem. And so—so, there's been—I mean, there's been times where, uhm—there's times where I—I've chosen to just reschedule or, uhm—he'll—he'll threaten me that I need to get home by a certain time, or—or he's going to beat me up. So, yeah, there's been times where I've attempted to do something, but I've chosen to just maybe try again

11

next week or—or—because I'd rather just—I'd rather just go home and not get beat up versus not listening to what he says and coming home when—when I'm done and then have to get—have to get slapped or kicked or, uhm—and if it's not physical, it's—it's verbal. He's constantly degrading me, belittling me, and it just—I just—I can't think. Like, I—I can't—I can't think, I can't focus because my mind is just—there's been times where I've—where I've had a visit with [I.O.A.] and I had to tell him that I was in court so that if I say I'm in court, that's the only time he won't constantly call me because he knows you can't have your cellphones in court. So, there's been times where I've had to tell him that I'm in court because if I didn't, he would constantly call me. And then I wouldn't be able to focus on having my time with [I.O.A.], like—and that's every day.

B.A. testified that Pigott did not know where she lived after his arrest in February 2021, and she had no reason to believe he knew her whereabouts at the time of trial. When asked what prevented her from attending services while Pigott was incarcerated and unable to contact her, B.A. said "I don't know."

Additionally, during trial B.A. claimed she had been sober since 2015 and asserted that any testimony or evidence claiming B.A. had admitted drug use since that date was mistaken. During trial, B.A. offered to submit to a hair follicle drug screening analysis administered the day after her testimony. Following this testimony, Liebert attempted to reach out to B.A. via text message and telephone on multiple occasions to set up the testing appointment. Liebert also offered to drive B.A. to the appointment. B.A. never responded.

The court also was "not persuaded that [B.A.] has consistently remained clean and sober" and did not find her self-reported date of sobriety credible. The court found credible Liebert's testimony that the Department prepared several referrals for B.A. to complete the required random UAs. The court did not find

12

B.A.'s reasons for failing to comply with this provision of the court's orders credible.

B.A. also testified that the Department never specifically offered her DV services, but just told her vaguely that there are DV resources where she could go for help. The trial court found credible Liebert's testimony and the testimony of other witnesses that DV services were reasonably available to B.A. throughout these proceedings. While the court did find credible B.A.'s admission that she was a victim of DV for a number of years and that she had not participated in or received advocacy services, the court noted that this was the first time B.A. was open and honest regarding her DV history.

The trial court specifically found that "the fact that one is involved in a domestic violent [sic] relationship is not a parental deficiency." It explained that "it is only when the parent shows poor choices in decision making which impact the health, welfare and safety of the children, including refusal to assess [sic] services which would provide protection for the children and the parent, that concerns arise. The court finds this is the case with [B.A.]." The trial court was also "not convinced [B.A.] is fully committed to the work needed to provide a safe home for her children," noting that B.A. was in contact with Pigott just three weeks prior to trial and "remained unwilling to terminate her relationship with Pigott."

The trial court found Washington-Harvey credible and agreed with her assessment that B.A. does not have the current ability to parent because she must overcome a number of challenges and obstacles, including proof of

13

longtime sobriety and the successful completion of numerous services. The trial court found B.A. unfit to parent by cogent, clear and convincing evidence and granted the petition to terminate B.A.'s parental rights. B.A. appeals.

## DISCUSSION

### Standard of Review

Parents have a fundamental liberty interest in the care and welfare of their children. Santosky v. Kramer, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). To terminate parental rights, the Department must prove the statutory elements set forth in RCW 13.34.180(1)(a) through (f) by clear, cogent, and convincing evidence. In re Dependency of K.N.J., 171 Wn.2d 568, 577, 257 P.3d 522 (2011). Clear, cogent, and convincing evidence exists when the ultimate fact at issue is "highly probable." In re Dependency of K.S.C., 137 Wn.2d 918, 925, 976 P.2d 113 (1999).

The trial court's findings of fact in a termination proceeding will not be disturbed so long as they are supported by substantial evidence in the record. In re Welfare of Hall, 99 Wn.2d 842, 849, 664 P.2d 1245 (1983). We defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. In re Welfare of S.J., 162 Wn. App. 873, 881, 256 P.3d 470 (2011).

### CASA's Brief

As an initial matter, B.A. moved to strike the brief submitted by the Court Appointed Special Advocate (CASA), Scott Alford. B.A. argues that the CASA is not a party to this appellate litigation, therefore the submission of the brief without

this Court's permission was improper. CASA contends this Court has discretion to consider the brief and that he was a party to the case, and thus, entitled to file a brief. While we agree that appellate courts have discretion to consider such a brief, we disagree that CASAs are parties to the appellate litigation.

This Court previously held that a guardian-ad-litem (GAL), in the same position as the CASA here, was *not* a party to the appeal of the underlying dependency case. In re Dependency of W.W.S. and C.G.S, 14 Wn. App. 2d 342, 469 P.3d 1190 (2020). The Washington State Supreme Court has previously recognized that a GAL or CASA is "treated as a party, but only for certain purposes and only in superior court." In re Dependency of D.L.B., 186 Wn.2d 103, 106 n.1, 376 P.3d 1099 (2016) (citing GALR 2(j), 4(h)).

This Court does, however, have the discretion to consider briefs from nonparties, decided on a case-by-case basis. RAP 10.1(e), (h). In the instant case, like that of W.W.S., B.A.'s requested relief on appeal is not based on the best interests of the children, but on whether the juvenile court committed legal error. See W.W.S., 14 Wn. App. 2d at 352. As a result, the CASA's input would not assist this Court in deciding on the merits of this appeal. This Court declines to consider the CASA's brief.

### Challenged Findings of Fact

B.A. challenges several findings of fact from the trial court below arguing there is insufficient evidence to support them. We disagree. Sufficient evidence supports the findings of fact that are the bases of the decision to terminate the parent-child relationship. There is one error within finding of fact 7, which

provides:

> This Dependency action began on October 29, 2019 with the filing of Orders of Dependency for the children in King County Superior Court.  At the time, the court recommended the following services for [B.A.]: (1) Chemical and Alcohol Dependency Assessments and follow treatment recommendations; (2) Psychological Assessment with Parenting Component and follow treatment recommendations; (3) Foster Care Assessment Program; (4) Domestic Violence Assessment and follow treatment recommendations; (4) Evidence Based Parenting Program; (5) Random Urine Analysis ("UA's").  Supervised parental visitation a [sic] for two (2) hours and a minimum of twice per week.  [B.A.] signed the order as did her attorney, Ms. Munroe.

B.A. contends, and the Department concedes, that this finding incorrectly states that the 2019 order of dependency required [B.A.] to engage in a "DV assessment."  The October 29, 2019 dependency order did not include a DV assessment.  On its face, the redundancy in listing two services numbered "(4)" and the text of the dependency order recommendations suggest the mistake in this finding was a scrivener's error.

As Washington-Harvey explained, a DV assessment and recommended treatment is what is ordered for perpetrators of DV, not victims of DV.  Nothing in the record suggested that B.A. was alleged to be a perpetrator of DV.

B.A. next challenges findings of fact 10 and 12, which provide:

10. "[B.A.] argues given the circumstances, the Department should have known she was involved in a violent relationship and should have discussed and offered DV services to her continually throughout these proceedings.  The court is not persuaded by [B.A.]'s argument."

. . . .

12. The court finds Ms. Liebert credible and other witnesses credible that DV services were reasonably available to [B.A.] throughout these proceedings.  However, [B.A.] remained in

16

denial of her need for these resources. She continually denied being involved with Mr. Pigott. Thus, making it impossible to provide DV services to [B.A.] until she was ready to leave her relationship.

B.A. argues that finding of fact 10 "erroneously dismisses B.A.'s argument." B.A. also argues that the record does not support finding of fact 12, that B.A.'s relationship with Pigott made it impossible to provide her with DV services. The trial court did find credible B.A.'s admission that she was a victim of DV for a number of years and had not participated or received advocacy services. The court also noted that at trial was "one of the first times B.A. was open and honest[] regarding her history with Domestic Violence."

Laygo, who interacted with B.A. soon after the children were removed from the home she shared with Pigott, testified that she offered B.A. DV services by providing information on DAWN and LifeWire both in writing and by text message. Liebert also testified that she discussed DAWN with B.A. despite the fact B.A. repeatedly claimed Pigott was no longer in her life and that she did not need the services. B.A.'s claim was consistent with her demeanor and the independent research of addresses did not contradict B.A.'s claims. Under these circumstances, substantial evidence did not support a finding that the Department should have known B.A. was in a violent relationship warranting the Department to offer DV services beyond what it had already offered and been rejected.

Also, the record reflects that the DV services offered by the Department are voluntary. Neither the Department nor a court can compel a person to engage in those services. There was no way for B.A. to participate in those

17

services unless she was willing to do so. Additionally, B.A. herself admitted that she had not been truthful with the Department about her relationship with Pigott. Substantial evidence supports the finding that it was impossible to provide DV services to [B.A.] until she was ready to leave her relationship.

B.A. next challenges finding of fact 11, which provides:

> Domestic violence is complicated. Victims are often in denial or feel committed and protective of their abusive partner. Even when victims are aware of services, they often will decline assistance until they are ready for help. However, the fact that one is involved in a Domestic Violent relationship is not a parental deficiency. It is only when the parent shows poor choices in decision making which impact the health, welfare and safety of the children, including refusal to assess [sic] services which would provide protection for the children and the parent, that concerns arise. The court finds this is the case with [B.A.].

B.A. claims that this finding wrongly asserts she engaged in a pattern of refusal to access services which would provide protection for the children and herself. B.A. further states that the record does not support this finding because "nothing in the record demonstrates she refused any assessments of services." This was a disputed fact at trial and the court found Liebert and other witnesses credible that DV services were reasonably available to B.A. throughout these proceedings and that B.A. denied the need for these resources. Washington-Harvey testified that mental health counseling and cognitive behavioral therapy were recommended services that would help B.A. make better choices in the care of her children. It is undisputed that B.A. did not comply with these ordered services nor did she participate in recommended substance abuse treatment or monitoring. Substantial evidence supports this finding.

Appellant next challenges finding of fact 13, which provides:

Unfortunately for [B.A.], her desire for help only recently occurred. Furthermore, the court is still not convinced she is fully committed to the work needed to provide a safe home for her children, including braking free of violent relationships. Indeed, according to [B.A.], as recently as three weeks before the trial she was still in contact with Mr. Pigott. Mr. Pigott is currently incarcerated and awaiting trial on numerous felony criminal matters. [B.A.] knows her parental rights are in jeopardy, partially because of choices she made while involved in their relationship, yet she remained unwilling to terminate her relationship with Mr. Pigott.

B.A. argues that the court erred in characterizing her as "unwilling to terminate her relationship with Mr. Pigott." B.A. asserts that she wanted to end the relationship but had not done so because she was afraid of Pigott. However, while being afraid may explain *why* someone may be unwilling to terminate a relationship, it does not contradict the fact they still may be unwilling to do so. While B.A. may be rightfully afraid of Pigott, she testified that after he was arrested in February 2021, he no longer knew her address and that she had no reason to believe he knew where she lived. Yet, she chose not to terminate the relationship until she suggested as such at the time of trial. Substantial evidence supports finding 13.

The remaining challenges to findings of fact are incorporated below because they all relate to the same claim that B.A. should not be faulted for failure to comply with the dependency order because the Department failed to provide her necessary DV services.

### Services Offered

B.A. argues that DV services were a necessary service that the Department failed to offer before terminating her parental rights. We disagree.

The record supports that the Department did offer all necessary services capable of correcting a parental deficiency.

The Department is required to prove that "all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided" by the Department.  RCW 13.34.180(1)(d).  A necessary service is one "'needed to address a condition that precludes reunification of the parent and child.'"  In re Parental Rights to D.H., 195 Wn.2d 710, 719, 464 P.3d 215 (2020) (internal quotation marks omitted) (quoting In re K.M.M., 186 Wn.2d 466, 480, 379 P.3d 75 (2016)).  To meet the requirement of providing necessary services, the Department must "[a]t a minimum . . . provide a parent with a list of referral agencies that provide those services."  In re Dependency of D.A., 124 Wn. App. 644, 651, 102 P.3d 847 (2004).

B.A. argues that DV services were necessary to correct her parenting deficiencies and that the Department failed to provide those services to her.  B.A. claims the Department should have provided a "specialized domestic violence assessment" rather than a screening for the presence of DV.  However, B.A. fails to explain what she means by "specialized domestic violence assessment," which she maintains is required "once the Department determines a parent is experiencing domestic violence."[4]

---

[4] In support of this argument, B.A. cites for the first time on appeal the Washington Department of Social and Health Services Social Worker's Practice Guide to Domestic Violence, which was not admitted or even discussed at trial.  B.A. identifies this document as a legal treatise.  We conclude that this document is not law, regulation or a treatise and disregard any citation to it.

As Washington-Harvey testified to, the only formal DV assessments she is aware of are designed for perpetrators. Washington-Harvey could not think of an additional service beyond what she had already recommended, including mental health counseling and cognitive behavioral health therapy.

As explained in the Department policy admitted as Exhibit 65, the Department's Specialized DV Assessment is an "interview protocol, not a tool." Department intake workers and caseworkers must conduct this separate assessment when DV is identified in the family. This is done "to determine if the DV poses a threat to child safety or compromises the family's ability to address other [child abuse and/or neglect]." At the time Laygo investigated and assisted in drafting the shelter care order which included a DV assessment and recommendation, the children had just been removed from the home where B.A. and Pigott lived. By the time Liebert was assigned to the case and the dependency order was entered, the children had been removed from the home, and B.A. and Pigott, as far as the Department could deduct, were no longer living together, and B.A. claimed Pigott was not in her life. There was no threat of child abuse or neglect to the children as they had already been removed.

Substantial evidence supports the fact that the Department met its burden to prove by clear, cogent, and convincing evidence that the Department offered B.A. all services necessary to correct the parental deficiency of failing to protect

her children from her abusive relationship, including DV services.

We affirm.

_Coburn, J._

WE CONCUR:

_Smith, A.C.J._          _Dwyer, J._